[Crim. No. 6982. In Bank. June 4, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID CHARLES BICKLEY, Defendant and Appellant.

E. Fred Lightner, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James and Gilbert F. Nelson, Assistant Attorneys General, for Plaintiff and Respondent.

PETERS, J. — David Charles Bickley and John Larue Young were jointly charged with murder, and, with other defendants, were also charged with the commission of various robberies. Bickley, the only defendant involved on this appeal, pleaded not guilty and not guilty by reason of insanity to all charges. Pursuant to the provisions of section 1027 of the Penal Code, two alienists were appointed to examine him. They reported Bickley to be sane. Bickley then withdrew his insanity plea, and pleaded guilty to the five robbery counts. On the trial of the murder count, on the issue of guilt, the jury found both Young and Bickley guilty of murder in the first degree. On the penalty phase of the trial the same jury fixed the penalty for Young as life imprisonment, and for Bickley, fixed the penalty as death. This automatic appeal of Bickley is before us under the provisions of section 1239, subdivision (b), of the Penal Code.

No challenge is or can be made of the determination of guilt. Neither defendant offered any evidence on this issue, and both fully confessed upon their arrest. The record discloses no errors of any serious nature on the trial of this issue.

The facts produced by the prosecution on the guilt phase of the trial, while conflicting in a few minor immaterial details, demonstrate that during the perpetration of a robbery Bickley shot and killed one Elvin Boyd Feightner. Bickley and Young, about 10:30 p. m. on January 30, 1961, entered the Gold Room bar in Long Beach. Bickley was armed with a sawed-off shotgun which he had stolen. Young was armed with a knife. There were about 15 patrons in the bar. These were ordered to line up at the back of the bar. All did so but Feightner, who, it was stipulated, was then intoxicated. Feightner grabbed a beer bottle from the bar and threw it at Bickley. The latter then shot over Feightner's head, and warned him and the other patrons that he "meant business." He then jumped over the bar and tried to open the cash register which was locked. In the meantime, Feightner grabbed another beer bottle, broke it, and with this weapon in his hands, started slowly after Young. The latter backed up and yelled to Bickley for help. Bickley, with the shotgun in his hands, vaulted back over the bar. Feightner then started after Bickley. The latter, backing up slowly, warned Feightner to stop, and when Feightner continued towards him, Bickley asked the bartender to tell Feightner to stop because he, Bickley, did not want to hurt anyone. The bar-

tender warned Feightner, but the latter continued to stalk Bickley, and when he got close to him, Feightner swung the beer bottle at Bickley and grabbed at the gun barrel. Bickley then shot and killed Feightner. This was, of course, murder in the first degree.[1]

After the murder, Young and Bickley ran out of the bar and escaped in an "MG" automobile they had stolen several days before. The next day, Bickley and one Minnix (Young refused to participate) armed with the shotgun, held up a sporting goods store in Long Beach and stole six hand guns, two holsters, and several boxes of ammunition. After this robbery, the shotgun was thrown away at a spot where it was later found, and the "MG" car was abandoned, after Bickley had wiped it clean of fingerprints. Then Young and Bickley, accompanied by a young woman, left California in a stolen Chevrolet and drove to Flagstaff, Arizona, where they were arrested several days after the murder. Bickley was then armed with one of the stolen hand guns, and another one was found in the car. Both Young and Bickley made full and voluntary confessions to the officers, not only of the murder, but also of a series of robberies.

As already stated, appellant pleaded guilty to five counts of robbery. These charged the commission of that offense on January 16, 1961, two on January 27, 1961, one on January 30, 1961, and one on January 31, 1961.

On this evidence the jury brought in the first degree murder verdicts. The same jury tried the penalty issue. The first witness called by the prosecution was Dr. Crahan, one of the two alienists appointed by the court to examine Bickley after he had pleaded not guilty by reason of insanity. Over objection, the doctor testified that Bickley, in his opinion, was legally and medically sane at the time of the commission of the offense and at the time of the examination. Appellant contends that inasmuch as he had withdrawn his plea of insanity prior to the selection of the jury the issue of sanity was not before the jury, and such evidence was, therefore, not relevant and its admission violated his constitutional right of freedom from self incrimination.

The evidence as to mental condition was clearly relevant on the trial of the penalty issue, and was admissible

---

[1]Section 189 of the Penal Code provides in part: "All murder . . . committed in the perpetration or attempt to perpetrate . . . robbery . . . is murder of the first degree; . . . ."

under the broad provisions of section 190.1 of the Penal Code.[2] Section 1027 of the Penal Code provides for the appointment of alienists when the plea of insanity is entered and authorizes such alienists ''to examine the defendant and investigate his sanity, and to testify, whenever summoned, in any proceeding in which the sanity of the defendant is in question.'' Under these sections, when the defendant pleads insanity, the court is empowered to appoint an expert, and such expert may testify as to sanity in any portion of the trial where sanity is in issue. While, by withdrawing the plea of insanity after the court had already appointed the experts and they had already examined him, the appellant removed the issue of sanity from the guilt phase of the trial, because sanity then was no longer material or relevant to that phase of the trial, sanity, in the sense of mental condition, was still at issue on the penalty phase, and was obviously material and relevant on that phase of the trial. ■ Mental condition is one of the facts relating to appellant's ''background and history'' and is a fact ''in aggravation or mitigation of the penalty'' as those terms are used in section 190.1. Inasmuch as the appointment of the expert and the mental examination of appellant had taken place before the withdrawal of the plea, the expert was empowered to testify in any phase of the trial where mental condition was a relevant fact.

■ The contention that to permit the doctor to testify as to the results of his examination of appellant, violated appellant's constitutional privilege against self incrimination is untenable. The constitutionality of section 1027 of the Penal Code has been upheld against such attacks (*People* v. *Strong,* 114 Cal.App. 522 [300 P. 84]; see also *People* v. *Combes,* 56 Cal.2d 135, 149 [14 Cal.Rptr. 4, 363 P.2d 4]; *People* v. *Bundy,* 168 Cal. 777, 781 [145 P. 537]). Appellant submitted to the examination without complaint. He was not compelled to give the doctor information. This he did voluntarily.

After the doctor had given his opinion that defendant was medically and legally sane, he was asked if he had formed any ''opinion as to the defendant's general mental set up; that is, mental and character conditions of the time you

[2]That section provides in part: ''. . . Evidence may be presented at the further proceedings on the issue of penalty, of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. . . .''

examined him?'' Over objection that this did not relate to sanity, the witness was permitted to state, ''Yes. I believe this man is a behaviour problem as a result of a character defect, which is a condition that is irreversible. He is a sadistic, impulsive, criminal type who will not change.''

He was then asked if in his opinion defendant ''is capable or susceptible to any known rehabilitative process.'' He replied that defendant, ''because of the nature of the cause'' was not susceptible to rehabilitation. He explained this further on redirect when he stated that defendant ''is suffering from a character defect, which at times is called an asociopathic personality.'' On recross, when asked to explain this statement, the doctor stated that defendant's personality was incomplete, that ''It is what we call a character defect. There is a hole in his head, figuratively. There is an absence of something that would make him a normal individual, and that cannot be replaced.''

Appellant vigorously attacks this testimony, arguing that, even if evidence of sanity was admissible on the penalty phase, evidence as to whether appellant could be rehabilitated was not. Such evidence obviously related to appellant's mental condition and was admissible (*People* v. *Howk*, 56 Cal.2d 687 [16 Cal.Rptr. 370, 365 P.2d 426]). It definitely involved a factor that the jury was entitled to consider in passing on the penalty.

But errors, serious and prejudicial errors, were committed on this phase of the trial. These errors revolve around the erroneous admission of hearsay evidence as to the claimed deterrent effect of the death penalty, which errors were aggravated by the argument of the prosecution to the jury, partially based on that hearsay evidence, that the death penalty was, as to others contemplating crime, a more effective deterrent than life imprisonment.

The prosecutor produced as one of his principal witnesses, Inspector Wiggins. He testified that he had been a detective inspector for Long Beach for 30 years in charge of the robbery and homicide details, and that during that time he had investigated ''hundreds'' of robberies. He was then asked if he had any idea of what percentage of such robberies had been committed by persons with empty or simulated guns. He testified that according to his notes about half of all robberies that he had investigated had been committed with unloaded or simulated guns. He was then asked if he had

questioned these robbers as to their reasons for using unloaded or simulated guns. He replied that he had. He was then asked what reasons were given by these robbers for using such guns. The court sustained an objection to the question on the ground it was immaterial and hearsay, and then the following occurred:

"MR. COMPTON [prosecutor] : To show the deterrent effect of the death penalty, which is perfectly relevant in this proceeding.

"MR. LIGHTNER [attorney for Bickley] : I will object on the grounds of hearsay. This must be offered to prove the truth of the matter asserted, or it has absolutely no materiality.

"THE COURT: I understand the point. I am going to overrule the objection.

"MR. MEAD [attorney for Young] : May I make, your Honor, this further objection?

"THE COURT: Yes, sir.

"MR. MEAD : The officer is purporting to relate conversations he had with persons arrested. That person is not under oath and there is no way of determining that that is a true statement. There is no opportunity for defense to cross-examine on that point. I still think, your Honor, that it is hearsay and no proper foundation laid for it.

"MR. LIGHTNER : Their reasons are immaterial.

"THE COURT: Overruled.

"BY MR. COMPTON: Q. What are the [as]signed reasons by these people why they use them?

"A. The majority is they don't want to get in trouble with killing somebody. They are afraid of the penalty and also the degree of the crime.''

Even if it were to be assumed that proper evidence on the deterrent effect of the respective penalties for murder is admissible, which it is not, the evidence involved here was clearly hearsay, and therefore inadmissible. Obviously, the evidence had value only if a proportion of those caught attempting to commit robberies with unloaded or simulated guns in fact did so out of fear of the death penalty. Thus the truth of the matter asserted was the heart of the testimony. The credibility of the testimony did not turn upon Inspector Wiggins' credibility, but upon the credibility of the undefined and unidentified group asserted to have made the statement. These persons could not be cross-examined by the defense. By every legal test, this testimony was hearsay, and as such

inadmissible over objection. (6 Wigmore on Evidence (3d ed. 1940) § 1766, p. 178; McCormick on Evidence (1954) p. 460.)

 This error was aggravated by the prosecutor's misconduct during his opening and closing arguments to the jury. Substantial portions of these arguments were devoted to the assertion that the death penalty should be imposed because it is a more effective deterrent than life imprisonment, and that it is such a deterrent to others because many unidentified persons told Inspector Wiggins that this is so.

After properly arguing that murder committed in the course of a robbery was first degree, and that the death penalty would be a deterrent to appellant, as it undoubtedly would be, the prosecutor argued that: "Let's talk about the others, the deterrent effect. This is one of the things for punishment, if not the prime reason. We punish one person to stop other people from doing the same thing. You heard Inspector Wiggins tell you in his experience almost 50 percent of the robberies are committed with empty guns, because they know that if one goes off eventually it is the gas chamber. They will take a chance on doing a little time, this 18 months Mr. Nelson talks about, for robberies. Eighteen months—for parole possibility with an armed robbery. They will take a chance on that with an empty gun, but they won't take a chance on that gas chamber. I submit, Ladies and Gentlemen, that if one bandit goes out with one empty gun instead of a loaded one and thereby saves the life of one innocent grocery clerk, one innocent bank teller, one innocent policeman, one innocent citizen's life is spared by the fact that he went with the empty gun, instead of the loaded one; isn't it worth executing men like this to save one innocent life? If that is all it saves, Wiggins tells us 50 percent of them—because just think that if the gun had been empty here, Bickley would have got his head busted open with a beer bottle. Maybe they would have been able to scramble out of the place and get away. But nobody would be dead.

"I submit that this is one of the primary reasons why you must make an example of these men."

After referring to Dr. Crahan's testimony that Bickley could not be rehabilitated, the prosecutor read at length from an unidentified article supposedly written by John Edgar Hoover. In that article, not introduced into evidence, the author, after stating that law abiding citizens have a right to expect that the efforts of law enforcement officers in catch-

ing criminals will be followed by "realistic punishment," the author continued:

" 'The death penalty is a warning like a lighthouse throwing its beam out to sea. We hear about shipwrecks but we do not hear about the ships the lighthouse guides safely on their way. We do not have proof of the number of ships it saves, but we do not tear the lighthouse down.' "

Then the prosecutor continued: "The point is that it takes only a superficial knowledge of human nature to know that somewhere sometime a person is being deterred by the death penalty. We can't go out, and statistics show it, by interviewing everybody in the State of California. But we know it stops them.

"Wiggins is a good, concrete example of that, his testimony. Mr. Lightner says, 'How does he know it?' Many times robbers are caught as they run out of a door. They are caught within a block before they have time to get rid of anything. They have empty guns, water pistols, what-have-you. Why? Because they are stopped by that thought of that death penalty."

This argument was prejudicially erroneous for several reasons. In the first place, it was largely based on the inadmissible hearsay evidence of Inspector Wiggins. Not entirely satisfied with that, the prosecutor, in the last part of the argument quoted, *supra,* stated as facts matters about which there was no testimony at all. This is precisely the type of misconduct that was held to be erroneous, and prejudically so, in the recent case of *People* v. *Love,* 56 Cal.2d 720 [16 Cal. Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].

In the *Love* case the prosecutor stated as facts, without evidence, substantially what the prosecutor here stated, and also stated as facts substantially what Inspector Wiggins here was erroneously permitted to state as facts. The majority of this court held this to be reversible error. In the *Love* case, and also in *People* v. *Kidd,* 56 Cal.2d 759 [16 Cal.Rptr. 793, 366 P.2d 49], the defense was prohibited from introducing expert evidence from men trained in the field on the issue of whether the death penalty was or was not more of a deterrent to others than life imprisonment. In both cases this evidence was properly excluded. In *People* v. *Love, supra,* 56 Cal.2d at pages 725-726 (quoted with approval in *People* v. *Kidd, supra,* 56 Cal.2d at pp. 770-771) this court stated:

"The court did not err in dismissing defendant's subpoena for Governor Brown and Warden Duffy. Defendant volun-

tarily dismissed the subpoena for Warden Duffy. He had subpoenaed Governor Brown to elicit his views on capital punishment. The penalties for first degree murder have been fixed by the Legislature. (Pen. Code, § 190.) The wisdom or deterrent effect of those penalties are for the Legislature to determine and are therefore not justiciable issues. Hence evidence as to these matters is inadmissible. Juries in capital cases cannot become legislatures *ad hoc,* and trials on the issue of penalty cannot be converted into legislative hearings.''

In *People* v. *Kidd, supra,* 56 Cal.2d 759, the defense called two members of the legislative committee that had studied capital punishment, and a lawyer, and a San Quentin chaplain, as experts on the effect of capital punishment, and sought to elicit their beliefs as to whether or not the death penalty was or was not more of a deterrent to others than life imprisonment. Objections to this evidence proffered by the defense were sustained. The majority opinion states (p. 770) : ''The objections were properly sustained, and defendant's contention that the ruling of the trial court constituted prejudicial error is without merit. Innumerable witnesses could be produced to testify on both sides of the question whether the death penalty serves as a deterrent to crime.''

In denying a rehearing in the *Love* case the majority reiterated their position, using the following language (*People* v. *Love,* 56 Cal.2d 720, 748, at pp. 756-757) :

''The wisdom and deterrent effect of the death penalty are for the Legislature to determine, and are therefore not justiciable issues. Hence our holding that evidence thereon was inadmissible. Juries in capital cases are not legislatures *ad hoc* and trials on the issue of penalty are not to be converted into legislative hearings. Were it otherwise, counsel for both sides could prolong as well as confuse the trial on the issue of penalty with a tangle of conflicting evidence on the vigorously disputed proposition that the death penalty is a more effective deterrent than life imprisonment. Even the dissenters agree that 'certainly the . . . holding is correct' that the 'wisdom or deterrent effect of [the penalties of first degree murder] are for the Legislature to determine and are therefore not justiciable issues. Hence evidence as to these matters is inadmissible.' ''

These two cases stand for the proposition that expert evidence on the issue of whether or not the death penalty is a more effective deterrent than imprisonment is inadmissible.

Both cases assumed that the proffered experts were qualified, but held the evidence inadmissible. Certainly, if the defense cannot introduce such evidence neither can the prosecution. Thus even if Inspector Wiggins' testimony had not been hearsay, which it was, it would not have been admissible. Being hearsay offers an additional reason why it was not admissible in the instant case.

The argument was erroneous for another reason. Just as in *People* v. *Love, supra,* the prosecutor here purported to state in his argument as facts matters concerning which there was no evidence. Concerning such an argument this court had the following to say in *People* v. *Love, supra,* 56 Cal.2d 720, at page 732:

"Although counsel may illustrate a general truth, the illustration must not degenerate into an improper assertion of specific facts bearing on the case in hand. (See 6 Wigmore, Evidence (3d ed. 1940) § 1807, p. 266.) In the present case under guise of illustration the prosecutor improperly attempted to furnish specific facts to support his argument."

In addition to these very serious errors, the prosecutor was also guilty of misconduct in arguing to the jury that the death penalty was a more effective deterrent than imprisonment to the commission of crimes by others. It would serve no useful purpose to set forth in this opinion the many places in his opening and closing arguments in which the prosecutor referred to this subject. It is sufficient to state that the argument was not an incidental one, nor did it constitute but a minor part of it, as was true in *People* v. *Garner, ante,* p. 135 [18 Cal.Rptr. 40, 367 P.2d 680]. In the instant case the prohibited subject constituted a major and basic part of the argument.

In the *Love* case, *supra,* this court had the following to say concerning such argument (p. 731): "In the present case, however, the prosecutor went beyond merely urging severe punishment. He stated as a fact the vigorously disputed proposition that capital punishment is a more effective deterrent than imprisonment. The Legislature has left to the absolute discretion of the jury the fixing of the punishment for first degree murder. [Citations.] There is thus no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment. Since evidence on this question is inadmissible, argument thereon by prosecution or defense could serve no useful purpose, is apt to be misleading, and is therefore im-

proper." *People* v. *Friend*, 47 Cal.2d 749 [306 P.2d 463], insofar as it held to the contrary, was expressly "overruled."

The failure on the part of appellant to object to some of the errors discussed does not preclude him from raising the points on appeal (*People* v. *Love, supra,* at p. 732; *People* v. *Kidd, supra,* at p. 769).

The judgment insofar as it finds appellant guilty of murder in the first degree is affirmed, but the judgment, insofar as it imposes the death penalty, and the order denying a new trial on the issue of the penalty, are reversed and the case is remanded for a retrial and redetermination of the question of penalty only and for the pronouncement of a new sentence and judgment in accordance with such determination and the applicable law.

Gibson, C. J., Traynor, J., White, J., and Dooling, J., concurred.

McCOMB, Concurring and Dissenting.—I concur in affirming the judgment finding defendant guilty of murder in the first degree, but I would also affirm the judgment imposing the death penalty. (See *People* v. *Imbler, ante,* pp. 711, 718 [21 Cal.Rptr. 568, 371 P.2d 304]; *People* v. *Garner, ante,* pp. 135, 156 [23] [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Lane,* 56 Cal.2d 773, 787 [16] [16 Cal.Rptr. 801, 366 P.2d 57]; and see dissents of Mr. Justice Schauer and myself in *People* v. *Kidd,* 56 Cal.2d 759, 771 [16 Cal.Rptr. 793, 366 P.2d 49]; *People* v. *Love,* 56 Cal.2d 720, 734, 739, 748 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Howk,* 56 Cal.2d 687, 707 [16 Cal.Rptr. 370, 365 P.2d 426]; *People* v. *Purvis,* 56 Cal.2d 93, 99 [13 Cal.Rptr. 801, 362 P.2d 713].)

Schauer, J., concurred.