70 Cal.2d 480 (1969)
THE PEOPLE, Plaintiff and Respondent,
v.
THOMAS LAMAS VARNUM, Defendant and Appellant.
Crim. No. 12041. 
Supreme Court of California. In Bank. 
Feb. 25, 1969.
 Jay Plotkin, under appointment by the Supreme Court, for Defendant and Appellant. *483
 Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.
 SULLIVAN, J.
 A jury found Thomas Varnum, John Jackson and Edward Jackson guilty of assault with intent to commit robbery against James H. Fields (Pen. Code, 220), [fn. 1] first degree murder of Norman Merrill ( 187, 189), kidnaping of Norman Merrill for the purpose of robbery ( 209) and robbery of Norman Merrill ( 211). The jury fixed Varnum's punishment at death for both the murder and the kidnaping. [fn. 2] In People v. Varnum (1964) 61 Cal.2d 425 [38 Cal.Rptr. 881, 392 P.2d 961], we affirmed the judgment as to guilt and reversed as to penalty for error in argument by the prosecutor and instruction by the court of the type condemned by People v. Morse (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].
 Thereafter, on habeas corpus, we recalled the remittitur and reversed the judgment in its entirety on the ground that defendant's confessions had been admitted into evidence in violation of People v. Dorado (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (In re Varnum (1965) 63 Cal.2d 629 [47 Cal.Rptr. 769, 408 P.2d 97].)
 Upon retrial, defendant was again found guilty on all four counts charged. The jury fixed the penalty on the murder conviction at death and on the kidnaping conviction at life imprisonment without possibility of parole. On defendant's automatic appeal we affirmed as to guilt and reversed as to penalty because of the admission contrary to section 1111 of the uncorroborated testimony of an accomplice as to other crimes committed by defendant. (People v. Varnum (1967) 66 Cal.2d 808 [59 Cal.Rptr. 108, 427 P.2d 772], cert. den. 390 U.S. 529 [20 L.Ed.2d 86, 88 S.Ct. 1208].)
 The case is now before us on appeal after defendant's third penalty trial on the murder conviction. A jury again fixed defendant's punishment at death. This appeal is automatic. ( 1239, subd. (b).) *484
 On the evening of August 16, 1962, Norman Merrill was working alone as the attendant of a service station in Los Angeles. Varnum and the two Jacksons robbed the station of approximately $50 and, afraid that there might have been a witness to the holdup, compelled Merrill to enter the car of a customer of the station which had been parked there earlier in the day. Robert Garcia, a truck driver, saw the car leave the station with two young Negro men seated in the front seat and one in the back seat with Merrill. Finding no one at the station, Garcia called the police.
 Merrill's wallet was found by a passing motorist at 6:30 a.m. the following morning about 10 miles from the station. At 4 p.m. that afternoon John Russell, a maintenance mechanic, discovered Merrill's body lying face down in a storage yard near the place where the wallet had been found. After determining that Merrill was dead, Russell informed his employer who summoned the police.
 An autopsy showed that Merrill's death had been caused by two gunshot wounds in the back perforating the heart and the left lung. One bullet had remained in the body; the other had passed completely through and was found below the surface of the ground. Both bullets were fired from a single- action .41 caliber revolver, the same type of gun which Varnum had earlier borrowed from Thomas Hanks.
 On the evening of August 18th the police received an anonymous telephone call informing them that if they went to a specified address there would be someone there who could tell them about the disappearance of Merrill. The caller was John Ashton Victoria, a 16-year-old boy who lived with Edward Jackson and who was present on August 16 when defendant and the Jacksons were planning the robbery. Victoria thereafter named all of the persons connected with the crime and on this information the police arrested Varnum and the Jacksons.
 Considerable evidence received at the first trial was introduced by stipulation at the third penalty trial. Defendant did not take the stand in his own behalf and called only one witness, a religious adviser who testified as to her correspondence with Varnum about the Bible.
 Defendant contends 1) that the court committed prejudicial error in admitting evidence of other offenses not specifically charged in the information; 2) that the prosecutor committed prejudicial misconduct in arguing the deterrent effect of the death penalty; 3) that the trial court erred in failing to give *485 sua sponte the instruction set out in People v. Morse, supra, 60 Cal.2d 631; 4) that section 190.1 violates the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution; and 5) that he was denied his right to an impartial jury due to the exclusion of a prospective juror for cause in violation of the standards set out in Witherspoon v. Illinois (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. We have concluded that none of these contentions has merit. We therefore affirm the judgment.
 I. Evidence of other offenses not charged in the information
 The prosecution introduced evidence of two other robberies committed in the same general area and during the same month as those charged in the information. It consisted of the testimony of John Wyche and Donald Barton, the victims of the other robberies and of Thomas Hanks, an accomplice therein, who was the owner of the gun used to kill Merrill and who testified that he had accompanied defendant on these earlier robberies.
 Upon a previous appeal (see People v. Varnum, supra, 66 Cal.2d 808) we reversed the judgment as to penalty on the ground that the prosecution attempted to establish these earlier robberies solely by the uncorroborated testimony of the accomplice Hanks in violation of section 1111. [1a] It now appears that at the last penalty retrial, Hanks' testimony was corroborated by that of the two robbery victims and that a claim of error under section 1111 is not again raised. Rather defendant now contends that it was "a denial of due process ... to admit evidence of other crimes not specifically charged in the information" and that "the accused must be given prior notice of such crime so that he can prepare a defense. ..."
 [2] It is well settled that at the trial on the issue of penalty evidence of other crimes is admissible (People v. Tahl (1967) 65 Cal.2d 719, 736-737 [56 Cal.Rptr. 318, 423 P.2d 246]; People v. Mitchell (1966) 63 Cal.2d 805, 815-816 [48 Cal.Rptr. 371, 409 P.2d 211]; People v. Terry (1964) 61 Cal.2d 137, 143- 144 [37 Cal.Rptr. 605, 390 P.2d 381]; People v. Hamilton (1963) 60 Cal.2d 105, 129 [32 Cal.Rptr. 4, 383 P.2d 412], overruled on other grounds People v. Morse, supra, 60 Cal.2d 631, 649; People v. Bentley (1962) 58 Cal.2d 458, 460 [24 Cal.Rptr. 685, 374 P.2d 645]; People v. Pike (1962) 58 Cal.2d 70, 94-95 [22 Cal.Rptr. 664, 372 P.2d 656]), but *486 that such crimes must be proved beyond a reasonable doubt (People v. Hillery (1967) 65 Cal.2d 795, 805 [56 Cal.Rptr. 280, 423 P.2d 208]; People v. Tahl, supra, 65 Cal.2d 719, 736-737; People v. Polk (1965) 63 Cal.2d 443, 450-451 [47 Cal.Rptr. 1, 406 P.2d 641]; People v. Terry, supra, 61 Cal.2d 137, 149, fn. 8). [3] Contrary to defendant's claim, there is no requirement that to be admissible on the penalty phase of the trial, such other crimes must be specifically charged in the accusatory pleading. Nor is there any requirement that defendant be given other prior notice of them. [1b] Indeed, defendant has no cause for complaint in the instant case since he must have known from our previous reversal (see 66 Cal.2d 808) that the prosecution would again seek to establish the other crimes by sufficiently corroborated evidence. Furthermore the record clearly indicates that before the opening statement by the prosecution, defendant had actual notice that witnesses would be called to prove the earlier robberies.
 Finally, we observe that since defendant interposed no objection at trial to the introduction of the evidence of other crimes, he cannot now raise the objection for the first time on appeal. (People v. Tahl, supra, 65 Cal.2d 719, 735; People v. Cockrell (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116]; People v. Robinson (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834]; People v. Jones (1959) 52 Cal.2d 636, 646 [343 P.2d 577].)
 II. Alleged misconduct of the prosecutor
 Defendant asserts that the prosecutor committed prejudicial misconduct during his opening argument to the jury by making three separate references to the deterrent effect of the death penalty. We take up the three specifications in the order presented.
 First: By way of illustration, the prosecutor referred to a different type of homicide, namely a domestic "situational" killing. We set forth the pertinent portion of the argument in the footnote. [fn. 3] *487
 Second: After referring to two car thefts by defendant in 1959 and 1960 for which he was respectively committed to the Youth Authority and sentenced to imprisonment in the county jail, the prosecutor argued as to whether "incarceration is going to do him any good. ..." [fn. 4]
 Defendant did not make any assignment of misconduct or object in any way to either of the above arguments.
 Third: At the conclusion of his opening argument, the prosecutor then said: "Now, if you vote life, ladies and gentlemen, we will never be able to change that verdict. Just as a former verdict was life without possibility of parole as to the kidnaping charge, we can't change that verdict. That verdict stands. Before you decide what is a proper verdict, think of the consequences of that verdict. Think of the fact that if the verdict of this jury is the death penalty, that you may be preventing Mr. Varnum from ever killing again." Defendant's objection to the remarks was sustained and the jury admonished to disregard them.
 [4a] Defendant contends that in all three instances the prosecutor's remarks constituted an argument to the jury as to the deterrent effect of the death penalty and require a reversal under our holding in People v. Love (1961) 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]. (See also People v. Bickley (1962) 57 Cal.2d 788, 798-799 [22 Cal.Rptr. 340, 372 P.2d 100]; People v. Imbler (1962) 57 Cal.2d 711, 717 [21 Cal.Rptr. 568, 381 P.2d 304] (not prejudicial error); People v. Garner (1961) 57 Cal.2d 135, *488 156 [18 Cal.Rptr. 40, 367 P.2d 680] (not prejudicial error); People v. Lane (1961) 56 Cal.2d 773, 787 [16 Cal.Rptr. 801, 366 P.2d 57].) We disagree. The argument was not "that the death penalty was a more effective deterrent than imprisonment to the commission of crimes by others" (italics added; People v. Bickley, supra, 57 Cal.2d 788, 798), but that if defendant were given the death penalty, he would be deterred and indeed prevented from continuing his course of criminal conduct. We find nothing in the remarks expressly or by fair implication advancing the proposition that the imposition of the death penalty upon Varnum would serve to deter others from committing similar crimes. The tenor of the argument is entirely different from that in Love and even assuming arguendo some implication in it of a deterrent effect upon others, it still would not "embody any of the aggravated features of the argument which we found prejudicial in that [Love] case." (People v. Lane, supra, 56 Cal.2d 773, 787.)
 Further, as we have already indicated, defendant interposed no objection to the first two instances of alleged misconduct and the court sustained his objection to the third, properly admonishing the jury to disregard the remarks.
 [5] Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. (People v. Golston (1962) 58 Cal.2d 535, 541 [25 Cal.Rptr. 83, 375 P.2d 51], cert. den. 372 U.S. 955 [9 L.Ed.2d 979, 83 S.Ct. 954]; People v. Rosoto (1962) 58 Cal.2d 304, 357 [23 Cal.Rptr. 779, 373 P.2d 867], cert. den. 372 U.S. 955 [9 L.Ed.2d 978, 83 S.Ct. 953], remittitur recalled on other grounds, id., 62 Cal.2d 684 [43 Cal.Rptr. 828, 401 P.2d 220]; People v. Perez (1962) 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; People v. Wein (1958) 50 Cal.2d 383, 396 [326 P.2d 457]; People v. Lyons (1958) 50 Cal.2d 245, 262 [324 P.2d 556]; People v. Kirkes (1952) 39 Cal.2d 719, 726-727 [249 P.2d 1]; People v. Berryman (1936) 6 Cal.2d 331, 337 [57 P.2d 136]; People v. Basler (1963) 217 Cal.App.2d 389, 399 [31 Cal.Rptr. 884].)
 [4b] As to the first two remarks of the prosecutor it is clear that they fall within the above general rule and not within either of the above two exceptions, and that defendant cannot now raise an objection to the misconduct for the first *489 time on appeal. As to the third remarks, the jury was promptly and fully admonished so as to effectively cure any harmful results of the argument. (People v. Berryman, supra, 6 Cal.2d 331, 337; People v. Lyons, supra, 50 Cal.2d 245, 262.)
 III. Failure to give instruction set forth in People v. Morse
 Defendant contends that the trial court erred in failing to give the instruction set forth in People v. Morse, supra, 60 Cal.2d 631, 648. He argues that although the instruction was not requested, the court was required to give it sua sponte.
 In Morse we held that at the trial of a first degree murder case on the issue of penalty, it was error to receive evidence, to allow argument to the jury, or to give an instruction which permitted the jury to consider the possibility that the defendant, if given a life sentence, might be sometime paroled. We reasoned that the jury would "plunge into a judgment based upon conjecture" and preempting the whole parole system "would then utilize the death penalty for fear that the Adult Authority will not properly perform the function that the Legislature has specifically delegated to it." (60 Cal.2d at p. 644.) We concluded that such practice would "foster the dual vices of foisting upon the jury alien issues and concomitantly diluting its own sense of responsibility." (Id at p. 654.)
 However recognizing "that individual jurors often entertain some ideas of parole laws and might erroneously consider the effect of such laws upon a term of life imprisonment" (id at p. 647) we suggested in Morse "for the general guidance of the trial court" (id at p. 648) an instruction informing the jury of the general scheme of the parole system but admonishing them not to consider the matter of parole in determining the defendant's punishment. [fn. 5]prefatorially we said: "To avoid such unanswered queries and to prevent latent misconceptions, we believe the trial court, at the time of rendition of all instructions, should inform the jury in general terms that life imprisonment can result in parole but that such matters are of no concern to it." (Id at p. 647; fn. omitted.)
 [6] While we have had many cases before us since the time of Morse which have raised the Morse issue (People v. *490 Luker (1965) 63 Cal.2d 464, 477 [47 Cal.Rptr. 209, 407 P.2d 9]; People v. Price (1965) 63 Cal.2d 370, 373 [46 Cal.Rptr. 775, 406 P.2d 55]; People v. Hillery (1965) 62 Cal.2d 692, 713 [44 Cal.Rptr. 30, 401 P.2d 382]; People v. Rosoto (1965) 62 Cal.2d 684, 689 [43 Cal.Rptr. 828, 401 P.2d 220]; In re Shipp (1965) 62 Cal.2d 547, 556 [43 Cal.Rptr. 3, 399 P.2d 571]; In re Lessard (1965) 62 Cal.2d 497, 513 [42 Cal.Rptr. 583, 390 P.2d 39]; In re Lopez (1965) 62 Cal.2d 368, 382-383 [42 Cal.Rptr. 188, 398 P.2d 380]; In re Seiterle (1964) 61 Cal.2d 651, 658 [39 Cal.Rptr. 716, 394 P.2d 556]; In re Imbler (1964) 61 Cal.2d 556, 557-558 [39 Cal.Rptr. 375, 393 P.2d 687]; People v. Treloar (1964) 61 Cal.2d 544, 549 [39 Cal.Rptr. 386, 393 P.2d 698]; People v. Kroeger (1964) 61 Cal.2d 236, 247- 248 [37 Cal.Rptr. 593, 390 P.2d 369]; People v. Polk (1964) 61 Cal.2d 217, 233-234 [37 Cal.Rptr. 753, 390 P.2d 641]; People v. Arguello (1964) 61 Cal.2d 210, 214-215 [37 Cal.Rptr. 601, 390 P.2d 377], remittitur recalled on other grounds, id., 63 Cal.2d 566 [47 Cal.Rptr. 485, 407 P.2d 661]; People v. Hines (1964) 61 Cal.2d 164, 167-170 [37 Cal.Rptr. 622, 390 P.2d 398]; People v. Quicke (1964) 61 Cal.2d 155, 160-162 [37 Cal.Rptr. 617, 390 P.2d 393]; People v. Terry, supra, 61 Cal.2d 137, 141-142), we have never had occasion to clarify our opinion in Morse as to whether the instruction so specified therein was a mandatory instruction to be given on the court's own motion if neither counsel requested it. [fn. 6]
 We think that the whole tenor of our opinion in Morse clearly indicates, and our above-quoted language prefacing the instruction emphasizes, that the instruction is mandatory [fn. 7] *491 in capital cases, provided that in the light of the particular facts and circumstances the giving of the instruction will not confuse or mislead the jury. We believe, however, that the case before us falls within this proviso.
 [7] If the court had given the Morse instruction in the instant case it would have confused rather than assisted the jury. They had already been informed by both the court and counsel that defendant had been convicted of kidnaping for robbery and had been sentenced to life imprisonment without possibility of parole. We have no difficulty in conceiving their immediate perplexity if they had thereupon been further informed in the suggested language of Morse that the rendering of a sentence of life imprisonment "means that the prisoner may be paroled at some time during his lifetime. ..." (People v. Morse, supra, 60 Cal.2d 631, 648.) Such additional information would have been completely inconsistent with that initially received that defendant could never be paroled. It would have produced obfuscation, not light. We find no error.
 IV. Constitutionality of section 190.1
 [8] As previously indicated, defendant contends that section 190.1 violates the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. We considered this argument in In re Anderson and Saterfield (1968) 69 Cal.2d 613, 621-629 [73 Cal.Rptr. 21, 447 P.2d 117], and rejected it.
 V. The right to a fair and impartial jury
 [9] Defendant contends that one of the prospective jurors at his penalty trial was excused for cause by the prosecution in violation of the standards set out in Witherspoon v. Illinois, supra, 391 U.S. 510. Although Witherspoon was decided after defendant's trial it is clear that the case is applicable herein. (Witherspoon v. Illinois, supra, 391 U.S. 510, 523, fn. 22 [20 L.Ed.2d 776, 785].) *492
 Witherspoon holds that a "sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (Id at p. 522 [20 L.Ed.2d at p. 784].) The court excepted from this ruling only prospective jurors who "made unmistakably clear ... that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. ..." (Id at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) (Italics added.)
 Defendant asserts that prospective juror Yvonne Bronsal was erroneously excused for cause because she did not unambiguously state that she "would automatically vote against the imposition of capital punishment no matter what the trial might reveal. ..." (Id at p. 516, fn. 9 [20 L.Ed.2d at p. 781].) The complete voir dire of Mrs. Bronsal is set out in the margin. [fn. 8] As appears therein there was no voir dire examination by either counsel.
 [10] In our application of the rule announced in Witherspoon, we must determine whether the prospective juror who has been excused for cause made it "unmistakably clear" that he or she would automatically vote against the imposition of the death penalty regardless of the evidence in the case. Our task requires us to assess the responses of the venireman *493 in the full context of that portion of the court and counsels' voir dire examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place. The voir dire examination of a juror individually is not conducted in a vacuum; it is but a part of a broader process directed to an entire group of men and women designed to effectuate the selection of fair and impartial jurors. Before his name is drawn, the individual venireman is in attendance in the body of the courtroom, an involved subject of this process, addressed collectively with the other members of the panel by the judge, and, along with them, observing and aware of the individual examination of the veniremen whose names are first drawn. In short, in our probing of the juror's state of mind, we cannot fasten our attention upon a particular word or phrase to the exclusion of the entire context of the examination and the full setting in which it was conducted. [11] We are not unmindful of the Supreme Court's observation in Witherspoon that "it cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see People v. Bandhauer, 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900, 905]) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him." (Witherspoon v. Illinois, supra, 391 U.S. 510, 515-516, fn. 9 [20 L.Ed.2d 766, 781].) But neither the words "in a proper case" nor any other words, taken alone, can be seized upon as a touchstone by which to determine the quality of the juror under Witherspoon. We must evaluate them in context. As we have said apropos a cognate problem: "Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words." (Universal Sales Corp. v. California etc. Mfg. Co. (1942) 20 Cal.2d 751, 776 [128 P.2d 665].) (Traynor, J., concurring.)
 [12] Turning to the instant problem, we note that Mrs. Tanya Hokin to whom Mrs. Bronsal referred had already *494 been examined on voir dire by the court at some length. The substance of her testimony was that she was not certain that she could vote to impose the death penalty although she did not indicate that she would refuse to impose it under all circumstances. She was excused upon the exercise of a peremptory challenge by the defense. Accordingly, in our view, when Mrs. Bronsal initially replied that she was "of the opinion as Miss Hokin" she in essence meant no more than that she was not sure that she could ever bring herself to vote for the death penalty. This alone would not be adequate cause to exclude her under Witherspoon.
 After this initial and somewhat general inquiry of Mrs. Bronsal as to "any reason" she might have as to "why you could not sit on this case," the court made a more direct attempt to ascertain her attitude on the imposition of the death penalty. The judge asked her: "And it is your feeling at the present time, Mrs. Bronsal, under no circumstances in a proper case would you ever vote for that type of punishment?" If we confine our inquiry to the question, then Mrs. Bronsal's response--"Not the death penalty, no"--might appear ambiguous because nowhere in the question was it made clear to her that it was entirely in her discretion to determine what was a proper case. If we considered nothing more, we could not assume that Mrs. Bronsal thereby affirmed "that [she] could never vote in favor of [the death penalty] or that [she] would not consider doing so in the case before [her]." (Witherspoon v. Illinois, supra, 391 U.S. 510, 515-516, fn. 9 [20 L.Ed.2d 766, 781].)
 However, when we examine Mrs. Bronsal's testimony in the full context and setting of the voir dire examination conducted up until the time she was excused, her frame of mind as to the death penalty is brought clearly into focus. She stated that under no circumstances in a proper case would she ever vote for the death penalty. We need not attempt to determine whether, upon considering the above seven italicized words in context, the first three words--"Under no circumstances"--dominate the next four. If we can ascertain that Mrs. Bronsal was aware that she could decide what was the proper case, then it is sufficient that the first three words are present. In such event, their absolute negating force is unrestricted and they convey the idea of a vote against the death penalty automatically and regardless of the evidence in the case.
 Our examination of the record satisfies us that in responding *495 to the words "in a proper case" Mrs. Bronsal clearly understood that it was within her discretion to determine what was a proper case. She was the twenty-sixth venireman to undergo individual voir dire examination and she had presumably observed and heard twenty-five previous jurors answer questions as to their views on the death penalty. On numerous occasions throughout the one and one-half days of jury selection prior to the questioning of Mrs. Bronsal the court and counsel made clear that what was a proper case was purely within the determination of each individual juror. [fn. 9] Mrs. Bronsal presumably observed and heard such examination of previous veniremen; indeed the court and counsel often phrased their inquiries by referring to questions asked of prior prospective jurors. [fn. 10] We know that in fact Mrs. *496 Bronsal did listen to the prior voir dire from her response that she was able to hear adequately from her seat in the courtroom and also from her reference to the testimony of Mrs. Hokin, a prospective juror whose testimony was separated from that of Mrs. Bronsal by the intervening voir dire of two other veniremen. (See fn. 8, ante.)
 We conclude that since Mrs. Bronsal made it "unmistakably clear" that regardless of the evidence in the case she would automatically vote against the imposition of the death penalty, she was therefore properly excused for cause. Although defendant has asserted no other violations of the rule announced in Witherspoon, we have nevertheless made an independent examination of the record and are of the opinion that none exists. We are satisfied that the issue of defendant's penalty was determined by a fair and impartial jury.
 The judgment is affirmed.
 Traynor, C. J., McComb, J., and Burke, J., concurred.
 PETERS, J.
 I concur. While I believe the procedures in California by which the death penalty is imposed are unconstitutional (see dissenting opinion of Tobriner, J. in In re Anderson and Saterfield, 69 Cal.2d 613 at p. 635 [73 Cal.Rptr. 21, 447 P.2d 117]), this court by a four-to-three majority in that case has decided otherwise, and as long as the majority opinion remains the law of California, I am bound by it. Solely under compulsion of the majority opinion in that case, I concur in this opinion.
 Tobriner, J., and Kaus, J. pro tem., [fn. *] concurred.
 "But the doctors will come in and tell you that the man, although he deliberately bought the gun and pointed the gun and fired the trigger, his mind left him so he did not really premeditate. All right, if that is the case, we call it a situational killing and if a jury in that case, considering that the man has never been in trouble before, if the jury in that case votes life imprisonment it is a good verdict because the man will probably never marry another woman like that again.probably he will never kill anybody else like that again. You are not taking too much of a chance when you vote life with a man like that. He has never been in trouble before. The situation presented itself and he just sort of blew his stack."
 We do not think that the foregoing contains such implications as the argument in People v. White (1968) 69 Cal.2d 751, 761- 762 [72 Cal.Rptr. 873, 446 P.2d 993], where the prosecutor invited the jury to speculate from the defendant's attempt to escape on the day of his arraignment as to the possibility of his escape from prison in the future.
 Our reason for deciding as we did in Morse was to remove from the jury the temptation to consider the chances that the defendant might be paroled. We did not simply hold that the court should not mention the issue of parole at all, for we realized that jurors do hold misconceptions about the parole system which might have an impact on their deliberations. Rather, we held that the jury should be told about the possibility of parole in order to "prevent latent misconceptions." The instruction would thus seem to be mandatory in the usual death penalty trial because if nothing is said to the jury about parole then all of the "latent misconceptions" entertained by jurors concerning the parole system will remain.
 Q. Mrs. Bronsal, have you been able to hear all right from your seat in the back of the courtroom?
 A. Yes, I have.
 Q. Calling your attention to the nature of this litigation, do you know of any reason why you could not sit on this case?
 A. I am afraid I am of the opinion as [Mrs.] Hokin. I am doubtful I would be able to give a verdict of guilty--I mean of capital punishment.
 Q. Is that based on a conscientious objection to that type of penalty?
 A. I am afraid so.
 Q. And it is your feeling at the present time, Mrs. Bronsal, under no circumstances in a proper case would you ever vote for that type of punishment?
 A. Not the death penalty, no.
 The Court: Do you wish to inquire any further?
 Mr. Bubrick [defense counsel]: No, your Honor.
 Mr. Stovitz [prosecuting attorney]: Did you say "No," Counsel?
 Mr. Bubrick: "No."
 Mr. Stovitz: We have no questions. We ask she be excused for actual bias.
 The Court: Mrs. Bronsal, you will be excused. I will grant the challenge for cause, reserving again the defendant's objection and noting it for the record." (Italics added.)"
 "The State of California for the crime of murder, if the finding is murder in the first degree, the legislature has two possible alternative penalties."
 "One is life imprisonment and, second, the penalty is death, and the determination of the proper penalty is left, as I have indicated, in the sole discretion of the jury."
 In questioning a venireman who was excused for cause on motion of the prosecution, the court clearly stated the applicable rule: "So your frame of mind at this time, Mr. Rush, is if you were called upon to listen to the evidence in this case and listen to the law, and were called upon to decide the proper penalty, under no circumstances in any type of case would you ever vote for the death penalty; is that correct?"
 The prosecuting attorney often made reference to the fact that the choice of penalty was solely in the discretion of each juror in language similar to the following voir dire of prospective juror Ernest Schreiber: "And if in this case you were satisfied--you were satisfied in your mind, that the death penalty was a proper verdict, would you be able to sign that verdict?"
 Defense counsel went to great lengths to explain to veniremen the amount of discretion they had in deciding the proper penalty. As an example, the voir dire of prospective juror William McCall proceeded: "You understand if the evidence may preponderate by a ratio of 10 to 1 in either direction, it will be your decision and your decision alone based upon your personal evaluation of the evidence that will cause you to return whatever verdict you will?"
 "... So once you decide whether something is or is not a proper case, then you will make your determination because of that decision; do you understand that?"
 "... You understand you are to impose the death penalty only if you find it to be a proper case for the death penalty?"
 "... And I take it you must know by now that none of us can tell you what a proper case is? That is a subjective evaluation that you must make on your own." (Italics added.)
 The prosecuting attorney posed questions which closely followed the form of that asked of venireman Armando Rosales: "Now, Mr. Rosales, assume I asked you each and every question I asked Mrs. Clarke, [the first venireman questioned] questions concerning conjecture, questions concerning burden of proof, questions concerning your groups and your affiliations and your understanding in your mind as to what you consider as a proper case in a death penalty, would your answers be all the same?"
 Defense counsel also relied upon his questioning of prior veniremen as illustrated by the following inquiry made of prospective juror Rosemary Mallon: "Now if I were to ask you all the questions I have asked the other jurors, would your answers, generally speaking, be the same except to those questions which may refer to you personally?"
NOTES
[fn. 1] 1. Hereafter unless otherwise indicated all section references are to the Penal Code.
[fn. 2] 2. Defendants John Jackson and Edward Jackson were sentenced to life imprisonment for the murder and to life imprisonment without possibility of parole for the kidnaping. They are not parties to the instant appeal. (See People v. Varnum (1964) 61 Cal.2d 425, 426, fn. 1 [38 Cal.Rptr. 881, 392 P.2d 961]; In re Varnum (1965) 63 Cal.2d 629, 630, fn. 1 [47 Cal.Rptr. 769, 408 P.2d 97].)
[fn. 3] 3. "We have a situation of where you have a domestic situation where the wife has been giving the husband the benefit of her unhappy humor for many years and he is finally fed up and he goes out and he buys a gun and he comes back and says, 'Mabel, if you say another word, I am going to kill you,' so we have premeditation, and she says, 'Don't,' and he kills her and he says, 'I told you not to say another word to me,' and that is first degree murder.
[fn. 4] 4. If incarceration isn't going to do him any good for stopping him stealing automobiles do you think incarceration is going to do him any good for the crime he committed in this instance or is it just a situation where he will be waiting, waiting for the opportunity to escape? Waiting, waiting for the opportunity to commit another crime? Don't you think that they commit crimes in prison? You know, ladies and gentlemen, that they are not chained to a bed. They are not chained to a wall. They are not given bread and water and kept in some dungeon. The same things go on in prisons that go on in every day life."
[fn. 5] 5. As indicated supra, the complete instruction will be found in 60 Cal.2d at page 648. We see no reason for repeating it here either in whole or in part.
[fn. 6] 6. In the case of People v. Treloar (1964) 61 Cal.2d 544 [39 Cal.Rptr. 386, 393 P.2d 698], the prosecutor both during voir dire and on final argument told the jury to consider the possibility of parole. We reversed the penalty judgment noting that "aside from the affirmative errors which are now revealed in the light of the Morse decision, defendant did not have the benefit of the instruction proposed in Morse which removes from the jury's consideration the possibility of premature parole and compels the penalty jurors to assume that the defendant will not be released unless completely rehabilitated." (Id at pp. 549-550.) We did not, however, comment on whether in fact that instruction was mandatory since we had adequate other grounds for reversal of the penalty. (Cf. People v. Jacobson (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555].)
[fn. 7] 7. Prior to the Morse case the rule was that the jury could be told that they could consider in their deliberations the fact that the defendant could possibly be paroled if sentenced to life imprisonment. (See cases cited in Morse (60 Cal.2d 631, 637, fn. 2).) While there was a proper purpose in admitting this evidence, the entire issue got out of hand and it led to the jury's usurpation of the function of the Adult Authority as well as putting improper questions before the jury. We decided in Morse that the court should inform the jury generally about the scheme of parole in California and then make it clear to them that any issue of parole was no concern of theirs.
[fn. 8] 8. "By the Court:
[fn. 9] 9. In its introductory remarks to the assembled panel of veniremen the court stated: "Now in the State of California the law does not impose either of two possible alternative punishments, but leaves that in the sole discretion of the jury.
[fn. 10] 10. When questioning a member of the panel for the first time the court often began in a manner similar to the following voir dire of prospective juror Martin Glickman: "Have you heard anything here, as I have explained to the jury the obligations of the jury and what the type of case is that we are about to try, that would cause you to feel at this point you could not sit on a case of this nature?"
[fn. *] *. Assigned by the Chairman of the Judicial Council.