[Crim. No. 10905. In Bank. July 7, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD FLOYD KETCHEL and THOMAS EDWARD SEARS, Defendants and Appellants.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Thomas Edward Sears, in pro. per., Benjamin Dreyfus, under appointment by the Supreme Court, Garry Dreyfus, McTernan & Brotsky, Fay Stender and Donald L. A. Kerson for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—Donald Floyd Ketchel and Thomas Edward Sears were found guilty of first degree murder and first degree robbery. The jury imposed the death penalty for the murder. On appeal, we reversed the judgments insofar as they related to the death penalty. (*People* v. *Ketchel* (1963) 59 Cal.2d 503 [30 Cal.Rptr. 538, 381 P.2d 394].)[1] Upon retrial, the jury again imposed the death penalty. We reversed these judgments, both as to guilt and penalty, because confessions inadmissible under *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 1693, 398 P.2d 361], were allowed into evidence at their trial on guilt. (*People* v. *Ketchel* (1966) 63 Cal.2d 859 [48 Cal.Rptr. 614, 409 P.2d 694].)

The instant appeal arises from defendants' third trial. The jury found Ketchel and Sears guilty of robbery in the first degree and murder in the first degree. The jury fixed the penalty for the murder as death for Ketchel and life imprisonment for Sears.[2] Sears' appeal was consolidated with Ketchel's automatic appeal. (Pen. Code, § 1239, subd. (b).)

We summarized at some length in our first opinion the factual circumstances giving rise to the convictions. (*People* v. *Ketchel, supra,* 59 Cal.2d 503, 514-516.) In short, defend-

---

[1]H. B. Sears, a codefendant at the first trial, was also found guilty of first degree murder and first degree robbery. He received a sentence of life imprisonment for the murder, and we affirmed the judgment. (*People* v. *Ketchel, supra,* 59 Cal.2d 503.) His conviction is not before us on this appeal.

[2]The reporter's transcript shows that the trial court, in imposing sentence on Sears, recommended against parole. The judgment, as set forth in the clerk's transcript, imposes sentence on Sears of life imprisonment without possibility of parole. The judgment errs in this respect, as Penal Code section 190 provides for the alternative punishment for first degree murder of life imprisonment or death but not of life imprisonment without possibility of parole. We exercise our power under Penal Code section 1260 (see *People* v. *Enriquez* (1967) 65 Cal.2d 746, 749 [56 Cal.Rptr. 334, 423 P.2d 262]) to modify the judgment as to Sears to conform to the jury's verdict pursuant to Penal Code section 190.

ants robbed a grocery store in Monterey Park on June 9, 1961. As they fled from the market with about $1,000 in cash, George Elder, an off-duty policeman, pursued them. In the ensuing gun battle, Elder was shot and killed.

Defendants make the following six contentions in this proceeding. First, the trial court erred in refusing to give instructions requested by Sears on diminished capacity. Second, admission into evidence of eye-witness identifications emanating from unconstitutionally conducted police lineups requires reversal. Third, the prosecuting attorney committed prejudicial misconduct in his use of a .22 caliber pistol throughout the trial. Fourth, defendants were denied their constitutional right to a fair and impartial jury. Fifth, the death penalty, as applied in California, constitutes cruel and unusual punishment in violation of the California and United States Constitutions. Sixth, defendant Ketchel was denied a fair penalty trial in that no evidence, beyond the facts of the offense previously introduced at the guilt phase, was advanced in his behalf.

We shall explain that *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], requires the reversal of the judgment against Ketchel as to penalty. In view of this conclusion we do not discuss Ketchel's further attack upon the penalty trial set forth as the fifth and sixth points listed *supra*. Further, we shall specify why we have rejected defendants' remaining contentions.

## 1. *Instructions on Diminished Capacity*

As part of Sears's defense, his brother, H. B. Sears, testified that both defendants drank beer between 7 and 9 p.m. on the night of the robbery. The brother stated that in his opinion defendant Sears was intoxicated during the entire two hours.

Dr. Alberto Marinacci testified for defendant Sears. Dr. Marinacci stated that he had administered an electroencephalographic test to Sears in 1963 and concluded that Sears's brain functioned normally. At the time of the instant trial, in July 1966, he had run the same test after Sears had consumed two ounces of 86 proof vodka. The results showed that ''alcohol in this individual will stir up certain brain cells to discharge abnormal function, which may render the patient, may cause the patient to have abnormal behavior.'' Sears ''may and may not'' be ''aware of what he is doing'' and ''have conscious control over what he is doing'' after consuming alcohol. Dr. Marinacci admitted, however, that ''in order to

tell what the effect alcohol actually would have on Tom Sears, it would be necessary . . . to have a history of him.''

Apparently concluding that this testimony cast some doubt on the ability of Sears to formulate the requisite criminal state of mind, the trial court submitted that question to the jury under the following instructions. ''Murder which is committed in the perpetration or attempt to perpetrate robbery is murder of the first degree, whether the murder was intentional, unintentional or accidental.'' ''In the crime of robbery of which the defendants are accused . . . , a necessary element is the existence in the mind of a defendant of the specific intent to permanently deprive the owner of his property. If the evidence shows that a defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.'' The court also instructed the jury that, if it found that the homicide was not a direct causal result of robbery, it must nevertheless determine if defendants committed murder, manslaughter, or no crime at all. The court then defined murder and manslaughter without reference to the felony-murder rule.

These instructions correctly state the governing law. ▉ In cases in which the prosecution advances a felony-murder theory, defendant is entitled, upon a sufficient factual showing, to instructions negating a conviction on a felony-murder theory if, at the time of the alleged offense, defendant could not form the specific intent—here, the intent ''to permanently deprive the owner of his property''—that serves as a necessary element of the felony charged. (Cf. *People* v. *Ford* (1966) 65 Cal.2d 41, 58 fn. 9 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Ford* (1964) 60 Cal.2d 772, 798-799 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Fortman* (1967) 257 Cal.App.2d 45, 51-52 [64 Cal.Rptr. 669].) ▉ In the instant case, the instructions to ''consider his state of intoxication in determining if defendant had such specific intent'' served this purpose of informing the jury that the absence of a specific intent to rob effectively rebutted the felony-murder theory.

Defendants, in resisting this analysis, rely primarily on the text of Penal Code section 189, which reads in part: ''All murder which is . . . committed in the perpetration or attempt to perpetrate . . . robbery . . . is murder of the first degree . . . .'' They contend that the initial reference to

"murder" in this section must be taken literally and that, since murder is defined as an unlawful killing with malice aforethought (Pen. Code, § 187), the prosecution must therefore prove that defendants harbored malice, not merely that they possessed the specific intent to commit robbery.

This court has rejected the proffered analysis on numerous occasions. ▮ "[W]hen one enters a place with a deadly weapon for the purpose of committing robbery, malice is shown by the nature of the attempted crime, and the law fixes upon the offender the intent which makes any killing in the perpetration of or attempt to perpetrate the robbery a murder of the first degree." (*People* v. *Coefield* (1951) 37 Cal.2d 865, 868 [236 P.2d 570]; see also, e.g., *People* v. *Washington* (1965) 62 Cal.2d 777, 780-781 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Sears* (1965) 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938].) In short, the law presumes malice aforethought on the basis of the commission of the felony.

To buttress their argument, defendants rely on the following language contained in an instruction approved in *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]. "Malice is an essential element of either degree [first or second] of murder. Therefore, if you find that the defendant did not harbor malice because of his diminished capacity, or have a reasonable doubt whether he harbored malice, you cannot find him guilty of a higher offense than manslaughter." (64 Cal.2d 310, 325, fn. 4.) In *Conley,* however, this court specifically limited its approval of the quoted instruction to instances in which the trial court instructed the jury on culpability for homicides not falling within the felony-murder rule.

## 2. *Constitutionality of Eye-Witness Identifications*

▮ The prosecution's case rested primarily on eight eyewitnesses to the robbery who identified Ketchel and Sears as the guilty parties. Each of these witnesses had attended at least one police lineup at which they were requested to designate the robbers. Ketchel and Sears, who apparently participated in each lineup, were not represented by counsel at any of these proceedings.

Defendants rely on the recent Supreme Court cases of *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], which hold that in-court identification by witnesses to whom the accused was exhibited before trial in the absence of counsel must be excluded, with

certain exceptions not relevant here. They recognize that the Supreme Court has held that *Wade* and *Gilbert* are not retroactive (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]), but they urge that, as a matter of discretion, we adopt a more stringent standard and make these rulings retrospective. (Cf. *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) We have, however, considered this contention and rejected it. (*People* v. *Feggans* (1967) 67 Cal.2d 444, 448-449 [62 Cal.Rptr. 419, 432 P.2d 21].) Accordingly, since the lineups at issue did not occur after June 12, 1967, defendants' contention based on denial of the right to counsel lacks merit. Nor does anything in the record suggest that the police conducted the lineups in such an unfair manner as to violate due process of law (cf. *People* v. *Caruso* (1968) 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]).

3. *Use of the .22 Caliber Gun by the Prosecutor*

During the course of the trial, the prosecutor used, for illustrative purposes, a .22 caliber gun, apparently taken from defendant Ketchel but not identified to the jury as having been so obtained. Several witnesses to the robbery stated that Ketchel was armed with a weapon similar in appearance to the gun held by the prosecutor, and one witness testified that the weapon held by Ketchel looked like a .22 caliber gun. One of the bullets recovered from the deceased was a .22 caliber bullet.

Defendant Ketchel argues that he suffered prejudicial error in that the prosecutor used this .22 caliber pistol throughout the trial as if it were Ketchel's gun and had fired one of the fatal shots. Ketchel argues that the gun was obtained as a result of an illegal search and seizure and concludes that the prosecution should not have been permitted to introduce it into evidence or otherwise identify it as belonging to him.

Prior to trial, however, Ketchel's attorney had agreed that the prosecutor could use the gun for illustrative purposes at the trial. The prosecutor acted pursuant to this agreement; in adducing testimony that the illustrative .22 caliber gun resembled the one used by Ketchel and that a .22 caliber bullet lodged in the deceased officer, the prosecutor merely attempted to persuade the jury to infer that Ketchel fired a fatal shot. Defendant's present claim of error in this regard does not merit our consideration because of his waiver prior to trial of any objection to such use. We do not find that the

prosecutor suggested to the jury that the gun shown to the witnesses was in fact Ketchel's.

### 4. Denial of a Fair and Impartial Jury

 During the *voir dire* several prospective jurors who expressed conscientious scruples as to the death penalty asserted that they nevertheless could reach an impartial decision as to guilt. The trial court excused these jurors for cause. Defendants contend that this procedure violated their constitutional right to a fair and impartial jury. They argue that persons without scruples as to the death penalty are "more rigid," "more punitive," and "less humanitarian" than those with such scruples. Accordingly, they assert, the practice of excusing scrupled jurors from the guilt trial leaves the jury more likely to convict defendant than a jury chosen from a cross-section of the community. They conclude that a jury so selected could not constitutionally convict them.

We have rejected precisely this argument on numerous occasions, most recently in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. (See also *People v. Gonzales* (1967) 66 Cal.2d 482, 497-499 [58 Cal.Rptr. 361, 426 P.2d 929]; *People v. Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People v. Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365], revd. on other grounds *Gilbert v. California, supra,* 388 U.S. 263.) In the absence of more persuasive documentation of defendants' contention, we must agree with the United States Supreme Court's conclusion on this same point: "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." (*Witherspoon v. Illinois, supra,* 391 U.S. 510, 517-518 [20 L.Ed.2d 776, 782].)

 The judgment imposing the death sentence on defendant Ketchel must be reversed, however, because the method of determining whether prospective jurors with conscientious scruples as to the death penalty should be excused for cause did not comply with the guidelines laid down in *Witherspoon v. Illinois, supra,* 391 U.S. 510.[3] In *Witherspoon,* the United States Supreme Court held that a "sentence of

---

[3] Since the instant trial took place prior to the decision in *Witherspoon,* the trial court's rulings are entirely understandable under the previous cases.

death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty .or expressed conscientious or religious scruples against its infliction.'' (P. 522 [20 L.Ed.2d at pp. 784-785].) The court excepted from this ruling only prospective jurors who ''made unmistakably clear . . . that they would *automatically* vote against the imposition 'of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . .'' (P. 522, fn. 21 [20 L.Ed.2d at p. 785].)

Although 11 jurors were excused for cause because of conscientious scruples as to the death penalty, we shall limit our discussion to the error in the *voir dire* of Mrs. Nell D'Arcy.

We set forth the complete *voir dire* of Mrs. D'Arcy:

''Q. [by the Court] Mrs. D'Arcy, have you served on a jury before?

''A. No, your Honor.

''Q. This is your first experience?

''A. Yes.

''Q. And you have heard the general questions that have been asked concerning knowledge of witnesses and parties and attorneys. I take it that you know none of the parties or the witnesses; is that correct?

''A. That is correct.

''Q. And you never heard of this transaction?

''A. That is correct.

''Q. And if you felt from the evidence that this was *a proper case* for the imposition of the death penalty, could you vote for the imposition of the death penalty if you believed that *it was a proper case*?

''A. No, your Honor, I could not.

''Q. You believe that you entertain such a conscientious objection that even *in a proper case* that you could not impose the death penalty, assuming it was—

''A. I do.

''THE COURT: Do you have any challenges?

''Mr. Lewis [deputy district attorney] :—for cause, your Honor.

''Mr. Ettinger [counsel for defendant Sears] : May I ask my question?

''THE COURT: Very well.

''Mr. Ettinger: Mrs. D'Arcy, do you feel that you would be able, realizing that there are two parts to the trial, you would

be able to render a verdict as to the question of guilt or innocence of the defendants?

"JUROR D'ARCY: Yes." (Italics added.)

The court then granted the prosecution's challenge for cause.

The use of the test of a "proper case" to determine whether the juror believes he cannot render a death penalty verdict has been specifically condemned in *Witherspoon*. ▆ Thus, the Supreme Court of the United States has stated: "As the *voir dire* examination of this venireman illustrates, it cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or *against its infliction 'in a proper case'* (see *People* v. *Bandhauer*, 66 Cal.2d 524, 531, 426 P.2d 900, 905) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him." (Italics added.) (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 515-516, fn. 9 [20 L.Ed.2d 776, 781].)

Indeed, the very procedure which the Supreme Court condemned in *Witherspoon* involved the use of the misleading terminology of the "proper case." Thus in describing the Illinois procedure, the Supreme Court points out "[t]hirty-nine veniremen, including four of the six who indicated that they did not believe in capital punishment, acknowledged having 'conscientious or religious scruples against the infliction of the death penalty' or against its infliction *'in a proper case'* and were excluded without any effort to find out whether their scruples would invariably compel them to vote against capital punishment." (Italics added.) (Pp. 514-515 [20 L.Ed.2d at p. 781].)

▆ As *Witherspoon* explains, in substance, the danger of this "proper case" terminology lies in the ambiguity it necessarily lodges in the mind of the prospective juror. The venireman does not know what the law contemplates as a "proper case" for the infliction of the death penalty; he does not know whether the law establishes any standards for the determination of a "proper case"; he does not know what the judge may regard as a "proper case." As an example, he may believe that the law calls for the death penalty in a simple case of rape. The venireman may conclude that he could not vote for a death penalty in such a "proper case" of rape and therefore that he should not serve. Yet that venireman is not one who "would *automatically* vote against the infliction of capital punishment without regard to any evi-

dence that might be developed at the trial of the case before [him]." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785].)

The broad designation of "a proper case" for the death penalty can cover a panoply of cases ranging from the non-homicidal offense of rape to the most horrendous murder, while between these extremes there will lie a countless variety of other cases. To which of this multitude of offenses does the term apply? To which will the prospective juror *think* it applies? As *Witherspoon* explains, "veniremen . . . cannot be excluded for cause simply because they indicate that *there are some kinds of cases* in which they would refuse to recommend capital punishment." (Italics added.) (P. 522, fn. 21 [20 L.Ed.2d at p. 785].)[4] We submit that the use of the "proper case" test tends to exact this result. As *Witherspoon* further states: "What matters is how [the language] might be understood—or misunderstood—by prospective jurors." (P. 516, fn. 9 [20 L.Ed.2d at p. 781].)

This court has held, however, that an inquiry of a venireman using the terms "proper case" does not automatically invalidate the dismissal of a prospective juror for cause. Thus in *People* v. *Varnum,* 70 Cal.2d 480 [75 Cal.Rptr. 161, 450 P.2d 553], the trial court had on numerous occasions fully explained to the panel that the determination of what was a proper case for the imposition of the death penalty was entirely within the discretion of each individual juror. Upon meticulous analysis of the entire preceding *voir dire* of jurors in the context of the questions asked a particular venireman, we held that the trial court properly excused her for cause even though the court in eliciting her attitudes on capital punishment had used the term "proper case." We held that: "Our task requires us to assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause." (*Supra,* p. 492-493.)

---

[4]It is no answer to this argument, of course, to state that the jury exercises complete discretion in choosing between life and death and thus that no cases *are* "proper" for the death penalty. "The critical question . . . is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 516, fn. 9 [20 L.Ed.2d 776, 781].) The veniremen might well anticipate, and reasonably so, that standards would govern the jury's decision as to penalty.

The following circumstances persuaded us in *Varnum* that the venireman who was excused for cause understood that it lay within her sole discretion to determine what was a "proper case." Thus in *Varnum* the court asked her: " 'And it is your feeling at the present time, Mrs. Bronsal, *under no circumstances in a proper case* would you ever vote for [the death penalty]?' " (Italics added.) We pointed out: "If we can ascertain that Mrs. Bronsal was aware that she could decide what was the proper case, then it is sufficient that the . . . words ["under no circumstances"] are present. In such event, their absolute negating force is unrestricted and they convey the idea of a vote against the death penalty automatically and regardless of the evidence in the case." (*People* v. *Varnum, supra,* at p. 494.) We further explained that the trial court and counsel had pointed out on numerous occasions and without misleading statements to the contrary during the prior *voir dire* that "what was a proper case was purely within the determination of each individual juror." (*Supra,* p. 495.)

*Varnum* thus specifies that the words "in a proper case" must be clarified to refer to that which is a "proper case" in the subjective judgment of the venireman. If the venireman understands that he must reach this conclusion and further agrees that "under no circumstances" would he ever vote for the death penalty, we have the substantial equivalent of a commitment to an automatic vote against the penalty. In *Varnum* we further emphasized that the venireman must realize that the determination of "what was a proper case was purely within the determination of each *individual* juror"; (italics added) (*supra,* p. 495) the decision must be his personal and separate judgment.

 Unlike *Varnum,* neither the trial court nor trial counsel during the *voir dire* preceding the examination of Mrs. D'Arcy properly defined the term "proper case"; she was not told that a "proper case" was one in which in her absolute and individual discretion she could under some circumstances[5] vote for the death penalty.

---

[5]In the instant case the trial court stated during its introductory remarks: ". . . [T]he court is required to ascertain if any prospective juror entertains such conscientious opinions [that] he or she would *under no circumstances* vote for the death penalty *in a proper case.*" When questioning other individual jurors prior to excusing Mrs. D'Arcy, the court invariably, and on no fewer than five occasions, used the "proper case" question without using the words "under no circumstances."

Although at one point in his introductory remarks before the interrogation of Mrs. D'Arcy, the trial court stated that the "jury has a *wide* discretion in determining whether or not it shall be life or whether it shall be death" (italics added), the word "wide" does not, of course, mean "absolute" and the designation of the jury collectively does not establish that the juror must reach an individual decision on the issue. Subsequently, the trial court referred to the "absolute discretion of the jury" on the issue but did not explain the discrepancy.

The record shows that the questions of court and counsel as to the "proper case" left the jurors in a state of confusion. This observation rests upon statements made by one juror who was excused for cause before Mrs. D'Arcy and by others who followed her. The comments of subsequent jurors illustrate their confusion as to the term "proper case," and that same confusion could well have occurred with Mrs. D'Arcy.

Mrs. Lemaire, who was examined before Mrs. D'Arcy, replying to a question as to whether, if she "felt from the evidence that this was a proper case for the imposition of the death penalty," she could not vote for that penalty, finally said, "Well, I feel that I could decide on the guilt or innocence of the party but I couldn't join in imposing the death sentence on that party. *I don't know if that is what you are saying or not.*" (Italics added.) Mr. Lagman likewise stated that he was not clear what the court was referring to in designating a proper case.[6] Finally, Mrs. Eastman, in attempting to understand the questions that had been put to her during the "last few days," emphatically declared that she was in a state of confusion.[7]

---

[6] "Q [by the court]: If you felt it was a proper case for the death penalty, you could vote for it in your opinion and following the court's instructions?

"A: I guess so, your Honor.

"Q: And, on the other hand, if you felt it was a proper case and it came to that stage for the imposition of life imprisonment, your verdict could be for that?

"A: Yes, your Honor.

"Q: In other words, whatever the evidence showed, and of course with the instructions of the Court concerning what constitutes first-degree murder, you would follow the instructions?

"A: That is what I am not clear on, your Honor. *What the Court might feel is proper I don't know whether it goes along—.*"

[7] "Q: [by counsel for Ketchel] . . . [C]an you think of anything at all in your mind on the various questions that have been made here the

Under these circumstances "it cannot reasonably be said, that veniremen who answered in the [negative the court's] question couched in 'proper case' language thereby made it 'unmistakably clear' that their scruples against capital, punishment rendered them incapable of exercising the sole discretion contemplated by section 190 and 190.1 of the Penal Code because they would *automatically* vote against the imposition of the death penalty regardless of the evidence." (*People* v. *Teale*, 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564].)

The determination of the juror's state of mind in answering the question cannot be fixed with exquisite precision; this court has decided that we must attempt to glean it from the totality of the record; this process is at best an approximate evaluation. In this delicate task we are bound by the constitutional mandate that the venireman's answer must be unambiguous and that in judging whether his exclusion was erroneous we must be clear "beyond a reasonable doubt" that the error was harmless: clear "beyond a reasonable doubt" that the venireman's answer could only mean exactly that which *Witherspoon* requires. (See *People* v. *Williams*, *ante*, p. 614 [79 Cal.Rptr. 65, 456 P.2d 633].)

Remembering that the United States Supreme Court has specifically ruled that the questioning of a venireman as to a "proper case" misleads him so that he cannot intelligently decide whether his objections to the death penalty would prevent him from passing upon whether a capital defendant should suffer death, we must find from the whole of the record that the term was clearly and precisely defined so that Mrs. D'Arcy knew the exact import of her answer. Although the instant issue is not clear from doubt and can support debate as to contradictory interpretations of the D'Arcy examination, this very lack of clarity, in view of the United States Supreme Court tests, prevents a positive validation of the procedure. Prior to the *Witherspoon* mandate the instant ambiguity was not only excusable but perhaps inevitable.

The judgment against Sears is modified by changing the sentence to life imprisonment and, as so modified, is affirmed.

last few days, anything at all you feel you should bring up now that prevents you from sitting as a 100 percent impartial juror?

"A: What I would like to ask really isn't a matter of being able to act fairly, but I am in a state of confusion as to what I have heard about instructions *in terms of penalty*." (Italics added.)

The judgment against Ketchel is reversed insofar as it relates to the penalty; in all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., and Peek, J.,* concurred.

BURKE, J.—I concur in the affirmance of the judgment against Sears, as modified.

I concur in the affirmance of the judgment against Ketchel in all respects except as to the reversal of the penalty as to which I dissent.

The majority base their reversal upon asserted violations of the subsequently announced decision of the Supreme Court of the United States in *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

In our recent unanimous decision in *People* v. *Varnum*, 70 Cal.2d 480 [75 Cal.Rptr. 161, 450 P.2d 553], this court laid down certain specific guidelines to govern our review of death penalty cases to determine whether prospective jurors were excluded in violation of the principles established in *Witherspoon*. This court said in *Varnum* (at p. 492-493): "In our application of the rule announced in *Witherspoon*, we must determine whether the prospective juror who has been excused for cause made it 'unmistakably clear' that he or she would automatically vote against the imposition of the death penalty regardless of the evidence in the case. Our task requires us to assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place. The *voir dire* examination of a juror individually is not conducted in a vacuum; it is but a part of a broader process directed to an entire group of men and women designed to effectuate the selection of fair and impartial jurors. . . . In short, in our probing of the juror's state of mind, we cannot fasten our attention upon a particular word or phrase to the exclusion of the entire context of the examination and the full setting in which it was conducted. We are not unmindful of the Supreme Court's observation in *Witherspoon* that 'it can-

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

not be assumed that a juror who describes himself as having "conscientious or religious scruples" against the infliction of the death penalty or against its infliction "in a proper case" (see *People* v. *Bandhauer*, 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 420 P.2d 900, 905]) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him.' (*Witherspoon* v. *Illinois, supra*, 391 U.S. 510, 515-516, fn. 9 [20 L.Ed.2d 776, 781].) But neither the words 'in a proper case' nor any other words, taken alone, can be seized upon as a touchstone by which to determine the quality of the juror under *Witherspoon*. We must evaluate them in context.''

I submit that the reasonable and fair application of these rules to the instant case indicates conclusively, just as it did in *Varnum*, that the charge of the majority here that venireman D'Arcy was improperly excluded is without foundation in fact.

The introductory statements of the trial judge to the veniremen in *Varnum* in pertinent part are set forth in a footnote.[1] It will be noted that the judge in the case at bench was even more explicit in addressing the panel of prospective jurors:

"Now in this case if you were, however, to find the defendants guilty of the offense charged, one of the penalties is death, and the Court is required to ascertain if any prospective juror entertains such conscientious opinions as would preclude his or her finding a defendant guilty, if the evidence should justify such finding, *or if he or she would under no circumstances vote for the death penalty in a proper case.*

"If you entertain such conscientious opinions, the law provides that you will not be permitted or compelled to serve as a juror. . . .

"If a defendant is found guilty of Murder in the first degree, an offense punishable by life imprisonment or death, there shall thereupon be further proceedings on the issue of

---

[1] " 'Now in the State of California the law does not impose either of two possible alternative punishments, but leaves that *in the sole discretion* of the jury.

" 'The State of California for the crime of murder, if the finding is murder in the first degree, the legislature has two possible alternative penalties.

" 'One is life imprisonment and, second, the penalty is death, and *the determination of the proper penalty is left*, as I have indicated, *in the sole discretion of the jury.*' " (*People* v. *Varnum, supra*, 70 Cal.2d 480, 495, fn. 9.)

penalty and the jury shall fix the penalty of death or life imprisonment.

"In other words, in a first-degree murder case, we have what is called a bifurcated trial. You first determine, the jury first determines as to whether or not a defendant is guilty of the crime as charged, that is, Murder in the first degree. If you find a defendant guilty of Murder in the first degree, then you will also proceed by a second trial to determine whether, on the matter of penalty, it will be life imprisonment or death, and *the jury has a wide discretion in determining whether or not it shall be life or whether the penalty shall be death in the case of first-degree Murder.*

"However, if the defendant is acquitted, as mentioned, or found guilty of a lesser offense than Murder in the first degree, then the jury does not consider the matter of penalty. *The law, as mentioned, imposes neither death nor life imprisonment but presents the two alternatives to the absolute discretion of the jury. The Legislature has formulated no rules to control the exercise of the jury's discretion.*

"The Court, therefore, inquires of the prospective jurors if there are any of you who entertain such conscientious opinions concerning the death penalty that would preclude you from finding a defendant guilty if the evidence should justify such finding.

"*Is there any juror who entertains such conscientious opinions that he or she could under no circumstances vote for the death penalty in a proper case?*" (Italics added.)

It would be difficult to conceive of how the trial judge could have improved his opening remarks to the panel as a whole to make it perfectly clear that by the phrase "in a proper case" he meant one in which the jury in the exercise of its "absolute discretion" determined the death penalty to be proper; that the law imposes neither death nor life imprisonment; and that the "Legislature has formulated no rules to control the exercise of the jury's discretion." The judge then noted that "any juror who entertains such conscientious opinions that he or she could *under no circumstances* vote for the death penalty in a proper case" (italics added) would be excused from serving.

In this manner the court in the instant case adequately impressed upon the minds of the jurors two of the crucial requirements of *Witherspoon* for the proper exclusion of jurors for cause: (1) That by the use of the term "proper case" is meant one which is left entirely within "the absolute

discretion of the jury," and (2) that the conscientious objections of a prospective juror to the imposition of the death penalty must be such that "under no circumstances" would the juror vote to impose the death penalty.

It is to be noted that these preliminary statements by the trial judge to the assembled panel, unlike those of the judge in *Varnum,* went into the second requirement of *Witherspoon* mentioned above that the conscientious objections of the prospective juror must be so firm that the juror under no circumstances would vote for the imposition of the death penalty regardless of the evidence in the case. In *Varnum* this second requirement was taken care of in the individual questioning of jurors which followed the judge's opening admonitions.

The majority limit their discussion of the *voir dire* examination of individual veniremen largely to that of Mrs. D'Arcy. In the interest of brevity we refer to the questioning of Mrs. D'Arcy as set forth in the majority opinion ( *ante,* pp. 635-650). The crucial question asked of her by the court was: "Q. And *if you felt* from the evidence that this was a proper case for the imposition of the death penalty, could you vote for the imposition of the death penalty if you believed that it was a proper case? A. No, your Honor, I could not." (Italics added.) I have italicized certain words to indicate that the judge was following up his introductory remarks, in which he told the panel that it would be up to the *jury* to determine penalty without any rules laid down by law, in order to make it clear to this *individual* juror that the decision as to penalty was not only the collective decision of the jury as a whole but was necessarily an individual decision for each juror. Notwithstanding the clarity of this question and the straightforward answer given, the court repeated the question in a slightly different manner in order to ascertain for certain that her objection to the death penalty was such that not even in a case in which she felt the death penalty could properly be imposed would she vote for that penalty: "Q. You believe that you entertain such a conscientious objection that even *in a proper case* that you could not impose the death penalty, assuming it was— A. I do."

When considered in conjunction with the preliminary statement by the court, the individual questioning of Mrs. D'Arcy indicated quite clearly that she was properly excused for cause. Since the majority single out the *voir dire* of Mrs. D'Arcy for attack, we may assume that they consider it the worst example of a *Witherspoon* violation.

It should be borne in mind also that the examination of Mrs. D'Arcy was preceded by the individual questioning of a number of other jurors in which the court and counsel repeatedly stressed that the decision as to what is a proper case is for the individual juror to decide from the evidence without guidelines or help from the law,[2] and furthermore that the strength of the juror's convictions against the imposition of the death penalty must be such that "under no circumstances" would he vote to impose that penalty.

Defense counsel Ettinger and Markey obviously were concerned that jurors opposed to the death penalty might be improperly excused from serving on the jury when it considered the issue of *guilt*, and they questioned a number of jurors as to whether their feelings with respect to the death penalty would preclude them from deciding the guilt issue. I submit that it was only as to this issue that venireman Lemaire indicated some confusion in her answers.

The majority quote a portion of the questioning of juror Lemaire (*ante*, p. 649) as indicating that this juror was confused as to what was meant by "a proper case." The particular portion quoted was after the *voir dire* examination by defense counsel Ettinger with respect to that juror's attitude on *the guilt* phase and not that of penalty. Juror Lemaire was the first juror to raise her hand when the judge had finished his preliminary explanation to the panel, detailed above, and had concluded with the general question: "*Is there any juror who entertains such conscientious opinions that he or she could under no circumstances vote for the death penalty in a proper case?*" (Italics added.) The court then

---

[2] In the questioning of jurors Lemaire, Blasco and Lindamood, which preceded the *voir dire* examination of Mrs. D'Arcy, each was asked whether his objections to the death penalty were such that he would not vote to impose it even if *he felt (or believed)* from the evidence that it was a proper case for the imposition of such penalty. In addition, as to the jurors ultimately excused for cause each was asked substantially the same question. Furthermore, jurors Lemaire and Kinslow each asserted that his convictions were such that *under no circumstances* would he vote to impose the death penalty. As to the other jurors excused, their firm opposition to imposition of the death penalty was expressed in varying ways, but I submit that a fair and reasonable reading of their *voir dire* examinations will reveal that it was to the same effect that under no circumstances would they vote to impose that penalty. Several (Taylor and Turner) stated that they could not even vote on the issue of *guilt* if it meant that the defendant would be put to death. Others asserted that they could not pass the judgment of death (Detlefsen), could not vote for it (Hayes) or even in a case in which they felt the evidence made it a proper case for the imposition of the death penalty, they could not vote for it (D'Arcy and Guzzo).

asked her: "In other words, is it your feeling that from the evidence, if this is a proper case for the imposition of the death penalty, that you could not or would not vote for the imposition of the death penalty because of your conscientious objection or opinion; is that correct? A. Yes sir."

Certainly there was no confusion shown by juror Lemaire up to this point. It was then that defense counsel Ettinger asked her concerning the guilt phase:

"Q. Mrs. Lemaire, his Honor posed to you a question in two parts, the first part of which was—I am going to paraphrase it—does your feeling in opposition to the death penalty or would your feeling in opposition to the death penalty preclude you from rendering a verdict on the issue of guilt, or could you decide that part of it?

"A. I could decide that part of it, but I don't believe in capital punishment. So when it got to the second part of it, I don't think I would be a proper juror.

"Mr. Ettinger: We would object on behalf of Defendant Sears to the challenge for cause of this juror.

"Mr. Markey: If it please the Court, may I join in the objection and also state for the record—and I don't intend to repeat this too often, your Honor, and I would request that I have a standing objection—but I feel that my client is entitled on the issue of *guilt* to a jury which has not had excluded, by reason of any conscientious objections, any part of the general public, and I feel that Mrs. Lemaire, in this particular instance, and anyone else in any instance, is part of the public from whom the jurors are selected. (Italics added.)

"I would object to anyone being excluded on the basis of cause who happens to hold such a conscientious objection. I do so based on the United States Constitution and the Constitution of the State of California."

At this point the judge again questioned juror Lemaire and the colloquy which followed her answer to one of the questions asked by the judge is seized upon by the majority to indicate confusion as to what was meant by "proper case." I submit, however, that when the *voir dire* is considered in its entirety rather than the isolated portion thereof selected by the majority it is apparent that juror Lemaire was not confused by the term "proper case" but rather was uncertain whether the judge was asking her if her feelings would prevent her from deciding the issue of (1) guilt or (2) penalty.

The majority refer to the examination of two other jurors, Mr. Lagman and Mrs. Eastman, to substantiate the statement

that there was confusion in the minds of the jurors as to what was meant by the phrase ''a proper case.'' As to juror Lagman, the majority quote three questions and answers to demonstrate this claim. (*Ante,* p. 649.) The *voire dire* of. this particular juror and the colloquy between court and counsel extend through 20 pages of the reporter's transcript, much of which was taken up by the juror's repeated assertion that he would vote to impose the death penalty only in cases of premeditated murder. He stated in part: ''Like I said, your Honor, if it would appear to be premeditated, cold-blooded murder, I think under that circumstance I could possibly vote for it.'' Subsequently, some confusion was brought about by the prosecuter's reference to the felony-murder doctrine (a robbery-murder). The latter pointed out that under the law a robbery-murder would also be a first degree murder, even though the murder was not premeditated, and asked whether the juror under such circumstances ''could bring [himself] to vote the death penalty?'' In a colloquy with counsel, the trial court summarized the juror's position by saying: ''He limits it to premeditation, as I understand his answers. First he answered the question that he couldn't give the death penalty when I gave him the question. Then he qualified it subsequently to add the word 'premeditation.' That is the only time that he would vote it. That is his definition, I suppose, of a proper case.

''Well, I will give the defendants the benefit of the doubt and *deny* the challenge.'' (Italics added.) Thus, it is obvious that this juror clearly understood that what is a proper case is for the determination of the individual juror.

In the examination of Mrs. Eastman, which immediately followed the questioning of Mr. Lagman, she indicated some confusion as to what she heard ''about instruction in terms of penalty.'' At this point defense counsel stated: ''I could say this just briefly and without conceding that we ever get that far in this trial, without conceding we ever get to a penalty phase. I think the Court has indicated to you and will indicate in the instructions that the penalty is up to you in your sole discretion. They will not say that if you find such-and-such-and-such, you give life, and if you find such-and-such-and-such, you come in with death in the gas chamber.

''The Court will say *you are the judge, and I say 'You' in the general sense of the jury and you as a separate individual member.* (Italics added.)

"Now, perhaps the Court will care to elaborate.

"THE COURT: Well, Mrs. Eastman, if the defendants are found guilty of murder in the first degree, an offense punishable by life imprisonment or death, there shall thereupon be further proceedings on the issue of the penalty. The jury shall fix the penalty of death or life imprisonment.

"The law imposes neither death nor life imprisonment but presents the two alternatives to the absolute discretion of the jury.

"The Legislature has formulated no rules to control the exercise of the jury's discretion.

"Does that clear the matter up for you?

"[MRS. EASTMAN] : Yes, it does."

These further explanations were substantially the same as those previously given before venireman D'Arcy was excused. Venireman Eastman apparently had not heard or paid close attention to the earlier explanations and expressly stated that the court's further explanations cleared up the matter for her. It is unreasonable to infer from her comments that venireman D'Arcy was confused by the court's prior explanations.

I am satisfied that the issue of defendants' penalty was determined by a fair and impartial jury, and I would therefore affirm the judgment in that respect.

McComb, J., and Sullivan, J., concurred.

The petition of appellant Sears for a rehearing was denied September 4, 1969.