[Crim. No. 16860. Second Dist., Div. One. Mar 6, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
COY LEE HALL, Defendant and Appellant.

**COUNSEL**

Albert D. Silverman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jerold A. Krieger, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**LILLIE, J.**—Defendant was charged with murder and assault with intent to commit murder; a jury found him guilty of first degree murder and assault with a deadly weapon, a lesser but included offense. He appeals from the judgment.

Around 5 p.m. on April 30, 1968, defendant and Bill Daugherty drove Mrs. Daugherty to work at the Hello Dare Bar, left and returned at 9 p.m.; around 11 p.m. defendant showed Bobby Ward a pistol and asked if he wanted to help rob a bar but Ward said he was not interested; about the same time Mrs. Daugherty asked defendant to drive home a Mr. Minute.

Schulter, Szcezsniak, Capley and Hermann (the deceased) were in the Jaguar Bar; around 11 p.m. defendant and Minute came in, talked briefly to Leslie, a barmaid, stayed about five minutes and left leaving their glasses half full. About 11:30 p.m., with a woman's knit stocking over his head and holding a gun, defendant re-entered the Jaguar Bar, ran to the passageway leading to the bar and fired a shot into the ceiling, then pointed a gun at Szcezsniak who dropped; the gun fired and Szcezsniak pushed defendant away and ran out of the bar with Capley; defendant hit Hermann on the head with the gun and shot him two or three times (Hermann died as the result of a gun shot wound); Schulter picked up a bar stool and hit defendant

on the side of the head and pinned him against the wall; defendant shot Schulter. After calling police Szczesniak returned to the bar and saw Leslie, then defendant, still wearing the mask and holding a gun, run out; he pursued defendant and when 15 feet behind, defendant turned the corner and was joined by Mr. Minute at which time defendant ripped off the mask; defendant and Minute got into and Minute drove away a 1959 Ford Fairlane, license number LOW 705; Szczesniak and Capley followed the Ford until Capley was able to write down the license number and description of the car, then returned to the bar and gave them to police.

Friends who had been visiting Gary Vincent were leaving around 1 a.m. (May 1) when they saw defendant outside bleeding with coagulated blood on the side of his face; he said he had been "rolled by four or five guys" and was out of gas; they took him to several stations which were closed; in their absence an officer stopped and asked Vincent about the Ford which was on the sidewalk, then left; when they returned they helped defendant push his car off the sidewalk. It appeared to Vincent defendant had been drinking; he called the police. When Officer Harworth arrived defendant was sitting in the car; he noticed he had a large 3 or 4-inch cut on his head and defendant told him he had been jumped by three or four men; they locked the car, a 1959 Ford Fairlane, license LOW 705, and he took defendant to the hospital; he noticed defendant's breath had a very strong odor of alcohol. Around 1:45 a.m. (May 1) a friend picked up defendant at the hospital; he noticed blood on defendant's face and defendant appeared to be intoxicated; he drove him to the Daugherty home. Defendant remained there until 9 a.m., then left to get the car, which belonged to Bill Daugherty; instead he went to a friend's house where he read he was wanted for murder, therefore he decided ᴛᴏ stay with friends in Santa Maria and started to hitchhike up north. Around 6:30 p.m. defendant was apprehended hitchhiking on Pacific Coast Highway.

Right after the shooting Officer Turman arrived at the Jaguar Bar and interviewed Leslie, Capley and Szczesniak; in the center of the street he found the woman's black knit stocking with bloodstains on it used in the holdup. Sergeant Hart saw blood on the sidewalk leading from the Jaguar to the corner, then into the street and down about 150 feet; he took blood scrapings from two bar stools and later, from the seat cover and passenger door of the Ford and the gun found in the car, and a sample of blood from Schulter. The blood from the gun, stocking, seat cover, right door frame and one of the bar stools was type A; Schulter has type AB, Hermann, type B and defendant, type A. According to Sergeant Lee, ballistics expert, a bullet removed from Schulter at the hospital and another taken from the wall of the bar were fired from the gun found in the Ford.

Defendant testified he went to the Hello Dare Bar but denied having a conversation with Ward; he had quite a bit to drink, including splitting a pint of Vodka with the Daughertys and another half pint with Daugherty and a few beers at the Hello Dare; later he was asked to take Mr. Minute, a Samoan, home; on the way they stopped at a bar, split two pitchers of beer and talked about barbiturates; they decided to buy some benzedrine tablets and he made a phone call to arrange for Minute to buy 25,000 "bennies." Defendant then told a long involved story of going to the dealer's (Joe's) apartment, getting the pills, returning to the Jaguar Bar, trying to raise the money there, finding the pills stolen from the car, returning to Joe's where Joe beat him up, and leaving in two cars—with Mawhinney and Joe who kept threatening him with a gun. He further testified that Minute then unsuccessfully tried to raise the money from another Samoan; they all drove to the Jaguar Bar in two automobiles; Minute and the other Samoan got out of the Ford and went into the bar; he was sitting in the other car with Mawhinney and Joe waiting for them when he heard a couple of shots; as they started up, the Samoan and Minute came around the corner and got into the Ford; Minute drove the car into a traffic circle, got out and ran but Joe ran after him; he tried to run the other way and the next thing he remembered was waking up alone in the front seat of his car with blood on him; as he drove away he ran out of gas, slammed on the brakes and ran up on the curb.

Mawhinney testified he was with defendant from the time they left Joe's apartment to the time defendant was left in the parking circle and that the cuts and bruises on defendant were due to Joe's beating.

On rebuttal Sergeant Howe testified as to the probable effect of alcohol from ingestion of certain quantities of alcoholic beverages; he was asked several hypothetical questions with two different variations substantially following defendant's testimony as to the quantity of alcohol he had on the day of the murder; under these hypothetical situations the approximate blood alcohol level of a person would be between .86 percent and 1.0 percent alcohol, with either of which in the blood stream a person would be dead.

█ Appellant claims the search of the Ford was illegal because the police had no search warrant, he was not arrested at the time, the Ford did not contain contraband or stolen material, the car was not stolen or abandoned and the officers could have applied for a search warrant.

In the morning of May 1, Officer Gillet was assigned to watch the 1959 Ford Fairlane, license LOW 705; he intended to arrest defendant for murder should he return to the vehicle; he watched it from 9 a.m. to 3 p.m. and believed that because it had been involved in a murder defendant would

return, thus he did not then search the vehicle; he observed on the front seat of the Ford a woman's black knit stocking similar to the one found by Officer Turman at the scene of the crime; around 3 p.m., because he felt defendant should have arrived by that time if he was going to return and that defendant was not coming back, he decided to search the car; in the vehicle he recovered the stocking, a bloody shirt and a .38 revolver in which were one live and four expended rounds; he impounded the vehicle.

While there is no evidence the officer believed the Ford to contain contraband or stolen property, the record shows that he knew it had been involved in a murder in that defendant had fled in it from the scene of the crime and later been found in it by an officer. Thus, having seen the stocking on the front seat and knowing of the murder and the use of the Ford as defendant's "get-away car" in which he had later been found bleeding, the officer had reasonable cause to believe that a search of the vehicle would produce either the instrumentality of or evidence relating to the specific crime of murder. Under these circumstances the officer properly searched the car even though at the time it was unoccupied. (*People* v. *Superior Court,* 264 Cal.App.2d 794, 796-797 [70 Cal.Rptr. 795]; *People* v. *Madero,* 264 Cal.App.2d 107, 111 [70 Cal.Rptr. 159].) In addition defendant's conduct supports the inference that he had abandoned the vehicle—the Ford, used by him as the "get-away car," did not belong to him; he knew that he was wanted for murder and that the Ford and its contents would connect him with the crime, thus he lay aside his plan to pick up the car, immediately left the city for Santa Maria and was apprehended eight or nine hours later on the Pacific Coast Highway headed north. Meanwhile Officer Gillet knew this was the vehicle in which defendant fled the scene of the shooting and later was found bleeding and contained a woman's knit stocking, and that defendant was wanted for murder, and must have known that the Ford was not registered to him. Under these circumstances and having waited six hours for defendant to return to the Ford, the officer could presume that defendant had abandoned the vehicle, and he was free to search it. (*People* v. *Smith,* 63 Cal.2d 779, 800-801 [48 Cal.Rptr. 382, 409 P.2d 222].) ██ "It is of no avail to suggest that the officer, having the car under surveillance, had time to secure a search warrant. 'The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' (*United States* v. *Rabinowitz,* 339 U.S. 56, 66 [94 L.Ed. 653, 660, 70 S.Ct. 430].)" (*People* v. *Superior Court,* 264 Cal.App.2d 794, 797-798 [70 Cal.Rptr. 795].)

██ Appellant urges error in the giving of a felony-murder instruction (CALJIC 302-F) because he claims there was no evidence of an attempt to commit robbery. The evidence is more than sufficient to support the instruction. Around 11 p.m. on April 30, 1968, defendant, sitting next to Bobby Ward in the Hello Dare Bar, pulled out of his waistband a .38 pistol,

later used by him in the shootings and found in the Ford; Ward went to the men's room and defendant followed holding the pistol; defendant asked Ward "if [he] would like to help him rob a bar" and Ward responded, "No, I don't want no part of it"; defendant told him, "There is nothing to it. When I put this stocking over my head, it shakes people up"; Ward said he wasn't interested; a few minutes later Ward saw defendant leave. Shortly thereafter defendant and Minute entered the Jaguar Bar and left in about 10 minutes without finishing their drinks; around 11:30 defendant re-entered; he ran into the Jaguar Bar with a stocking pulled over his head and holding a gun; he stood in the passageway to the bar used by the barmaid and owner and fired a shot into the ceiling, then pointed the gun at Szczesniak who ducked and pushed defendant away near Hermann who defendant hit on the head with the gun and shot. It is apparent that, with the stocking over his head standing in the passageway leading to the bar with a loaded gun which he fired into the ceiling, obviously to engender fear in those present, defendant would have committed the robbery had it not been frustrated by a free-for-all which developed in which he shot two men and had to flee.

■ After giving instructions on specific intent the court instructed "If the evidence shows the defendant was intoxicated at the time of the alleged offenses, the jury should consider his state of intoxication in determining if defendant had such specific intent." There is no merit to the claim that this was inadequate because it fails to state in a positive manner that the state of intoxication may affect the ability of defendant to form the necessary intent to commit the crime. The court in *People* v. *Ketchel,* 71 Cal.2d 635 [79 Cal.Rptr. 92, 456 P.2d 660], specifically approved this instruction as serving "this purpose of informing the jury that the absence of a specific intent to rob effectively rebutted the felony-murder theory." (P. 641.)

■ Defendant having voluntarily and deliberately, after fully discussing the legal effect with his counsel, withdrawn his proposed instruction on diminished capacity (CALJIC 319), an obvious tactical maneuver, he cannot now complain of the court's refusal to instruct on voluntary manslaughter based on diminished capacity. (*People* v. *Helfend,* 1 Cal.App.3d 873, 882 [82 Cal.Rptr. 295].) The record shows that the trial judge advised defendant he felt that the "diminished capacity instructions" would be applicable and he would give those instructions if he (defendant) felt there was any issue upon that subject, but defendant did not change his mind. Then the judge refused to give an instruction on voluntary manslaughter because in his view without diminished capacity there was no theory on any view

of the evidence upon which a finding of manslaughter could be predicated. And we agree with the trial judge that without diminished capacity no view of the evidence supports the statutory voluntary manslaughter instruction. ■ "Adequate provocation as an element of voluntary manslaughter must be affirmatively demonstrated; it cannot be left to speculation." (*People* v. *Williams*, 71 Cal.2d 614, 624 [79 Cal.Rptr. 65, 456 P.2d 633].) ■ First, the evidence shows that defendant entered the bar with a mask over his head holding a loaded gun with the intent to commit robbery and entered into a course of conduct which, had it not been frustrated, would have resulted in a robbery; second, there is no direct or circumstantial evidence to support an inference that anyone in the bar unlawfully provoked defendant. Under these circumstances the statutory voluntary manslaughter instruction was properly refused. (*People* v. *Williams,* 71 Cal.2d 614, 624.)

Appellant contends that since he was charged in the language of section 187, Penal Code, the People must prove premeditation or deliberation. Inasmuch as the contention of the People that Hermann was killed and Schulter was shot in the course of an attempted robbery must be sustained, we are not, therefore, called upon to consider or pass upon the sufficiency of the evidence on the issue of premeditation and deliberation. (*People* v. *Gutierrez,* 35 Cal.2d 721, 726 [221 P.2d 22].)

■ Finally, appellant cites several instances of what he claims to be prejudicial misconduct on the part of the deputy district attorney. The first, relating to whether he had ever been convicted of a felony, occurred in the course of cross-examination of Mawhinney. Appellant complains that the prosecutor had no independent proof of a prior felony conviction, did not ask the question in good faith and was not prepared to offer documentary evidence in the event Mawhinney denied the conviction; that Mawhinney admitted he had been convicted of a felony out of ignorance of the law; and that he had been convicted of a misdemeanor (appellant reminds us that second degree burglary can be made a misdemeanor by sentence to the county jail) and the prosecutor knew he was then in county jail. We find no bad faith on the part of the deputy district attorney. As to his lack of independent proof of the prior, the record shows that the prosecutor had no time in which to obtain it. The deputy district attorney was not aware that Mawhinney would testify as a major alibi witness until he took the stand, and so advised the court; defense counsel agreed that that was the first time Mawhinney had been identified to the prosecutor as such. "It is illogical to require that the prosecution outside of court first investigate

prior convictions of each defense witness when there may have been no opportunity to do so." (*People* v. *Foster,* 271 Cal.App.2d 763, 768 [76 Cal.Rptr. 775].) Only conjecture supports appellant's representation that the second degree burglary was in fact a misdemeanor and that it was through ignorance Mawhinney failed to deny the felony conviction. The record shows the contrary. While Mawhinney may then have been in the county jail, it is apparent he was there waiting to testify in this case, having been brought there from state prison. The testimony of appellant's mother reveals a letter she received from Mawhinney, postmarked two months before (November 22, 1968), from Chino, California; inside the envelope flap before it was sealed was written the information (name of prisoner, number, etc.) required on all letters mailed out of the state prison. The foregoing indicates that Mawhinney was in state prison at the time. Moreover, considering the astuteness of defense counsel, had the conviction been a misdemeanor it is likely that he would have brought this out at the time of trial. As to prejudice, it was known from Mawhinney's own testimony that he was then in the county jail; thus, if the question was improper "[t]his would tend to minimize the prejudice, if any, resulting from knowledge of [his] prior conviction." (*People* v. *Boehm,* 270 Cal.App.2d 13, 19 [75 Cal.Rptr. 590].)

■ During cross-examination of defendant the prosecutor asked him to identify "Joe"; defendant refused. Asked, "The reason you are not going to say is because he doesn't exist and we can prove it just as quickly as we can get the name and alleged address?" defendant responded this was not true, indicating he was afraid. Then over objection the prosecutor asked, "What could he [Joe] do to you? You are in custody. You stand an excellent chance of being convicted of first degree murder." Without argument or citation of authority appellant complains that the latter portion of the question was improper as an expression of the prosecutor's personal opinion of his guilt. This does not fall into the category of statements by a district attorney that defendant is guilty, that he believes defendant to be guilty or that he would not prosecute a man he did not believe to be guilty; even in those situations the courts hold "that such a statement is not prejudicial when based on a conclusion drawn from the evidence (*People* v. *Dick,* 200 Cal.App.2d 424 [19 Cal.Rptr. 317]; *People* v. *Romano,* 197 Cal.App.2d 622 [17 Cal.Rptr. 399]). Prejudice arises only if the prosecution's remarks are not based on evidence at the trial (*People* v. *Love,* 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809])." (*People* v. *James,* 218 Cal.App.2d 166, 173 [32 Cal.Rptr. 283].) Here, at the point the prose-

cutor asked the question the evidence was such that indeed defendant stood "an excellent chance of being convicted of first degree murder."

█ In seeking to impeach defendant the deputy district attorney asked, "Isn't it a fact that in 1957 you were convicted of robbery and burglary for which you served a term in state's penitentiary until 1964?" to which defendant replied, "That's true"; then, "It was an armed robbery, wasn't it?" and defendant answered, "Yes." █ Simple questions designed to identify the particular felony involved in the conviction are allowable; thus, the name or nature of the crime may be asked as well as the date and place of conviction. (*People* v. *Smith,* 63 Cal.2d 779, 790 [48 Cal.Rptr. 382, 409 P.2d 222].) █ Then defendant was asked, "In which a gun was used, wasn't it?" and he replied, "Yes, there was a gun used." While not a proper question, it was not until sometime later (350 pages later in the transcript) that defendant objected and moved to strike. The objection was sustained and the motion granted at which time the court instructed the jury that the question and answer were stricken, it could consider evidence of the conviction of a felony only for purpose of impeachment and it may not draw any inference of guilt or innocence from the fact of the prior conviction. In the light of this admontion and the clear evidence of guilt found in almost 3,000 pages of transcript, under no view of the record can we find this error sufficient to justify a reversal.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied March 25, 1970, and appellant's petition for a hearing by the Supreme Court was denied May 15, 1970.